UNITED STATES, Appellee

v.

Kimberly E. DOBSON, Sergeant
U.S. Army, Appellant

No. 05-0004

Crim. App. No. 20000098

United States Court of Appeals for the Armed Forces

Argued August 5, 2005

Decided March 20, 2006

EFFRON, J., delivered the opinion of the Court, in which GIERKE,
C.J., and BAKER and ERDMANN, JJ., joined. EVERETT, S.J., joined
and filed a concurring opinion. Judge CRAWFORD did not
participate.

Counsel

For Appellant: Mary T. Hall, Esq. (argued); Captain Jeremy W.
Robinson (on brief); Captain Charles L. Pritchard Jr.

For Appellee: Captain Michael C. Friess (argued); Colonel
Steven T. Salata, Lieutenant Colonel Theresa A. Gallagher, and
Captain Edward E. Wiggers (on brief); Captain Abraham F. Carpio.

Amicus Curiae: Peter M. Dapier (law student) and Daniel K.
Taylor (law student) (argued); Joanne Simboli Hodge, Esq.
(supervising attorney) (on brief); Ardath A. Hamann, Esq., for
the John Marshall Law School.

Military Judge: Patrick J. Parrish

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

Judge EFFRON delivered the opinion of the Court.

At a general court-martial composed of officer and enlisted members, Appellant was convicted, contrary to her pleas, of premeditated murder, in violation of Article 118, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918 (2000). The adjudged and approved sentence included a dishonorable discharge, confinement for life without eligibility for parole, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The convening authority waived automatic forfeitures for six months and directed payment of those funds to the guardian of Appellant's children. The convening authority also credited Appellant with 341 days of confinement against the sentence to confinement. The Court of Criminal Appeals affirmed in an unpublished opinion. United States v. Dobson, No. ARMY 20000098 (A. Ct. Crim. App. Aug. 20, 2004).

On Appellant's petition, we granted review of the following issues:

> I. WHETHER THE COURT-MARTIAL WAS IMPROPERLY CONSTITUTED WHEN THE MILITARY JUDGE (1) GRANTED PEREMPTORY CHALLENGES AFTER ENLISTED QUORUM HAD BEEN LOST THROUGH CHALLENGES FOR CAUSE AND (2) IMPROPERLY PERMITTED THE ADDITION OF OFFICER MEMBERS TO THE PANEL AFTER ASSEMBLY WHEN ONLY ENLISTED REPRESENTATION HAD FALLEN BELOW QUORUM.
>
> II. WHETHER APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS TO EVIDENCE OF HER MENTAL HEALTH STATUS WHEN DEFENSE COUNSEL (A) USED A PSYCHOLOGIST WHO VIOLATED

> PSYCHOLOGICAL PROFESSIONAL ETHICS STANDARDS;
> (B) FAILED TO CONSULT WITH A MENTAL HEALTH
> EXPERT RECOMMENDED BY THE R.C.M. 706 BOARD;
> (C) ARRANGED FOR APPELLANT TO CONSULT WITH
> MILITARY MENTAL HEALTH PROVIDERS WITHOUT
> ENSURING CONFIDENTIALITY; AND (D) FAILED TO
> USE MITIGATING INFORMATION FROM THE R.C.M.
> 706 REPORT.
>
> III. WHETHER THE MILITARY JUDGE ERRED BY
> EXCLUDING EVIDENCE OF SPECIFIC ACTS OF
> VIOLENCE BY THE PURPORTED VICTIM.
>
> IV. WHETHER THE EVIDENCE IS LEGALLY
> INSUFFICIENT AS TO THE FINDING THAT
> APPELLANT COMMITTED PREMEDITATED MURDER.

For the reasons set forth below, we conclude: (1) Appellant was tried before a properly constituted court-martial; (2) Appellant has not demonstrated a constitutional violation of the right to effective assistance of counsel; (3) the military judge erred in excluding the testimony of two witnesses offered by the defense; and (4) the error was prejudicial only as to premeditation, and does not preclude a finding of guilty to unpremeditated murder. We address the effect of the error in our decretal paragraph.

## I. THE DEATH OF SERGEANT DOBSON

Appellant and her husband, Sergeant (SGT) Terry Dobson,[1] were assigned to Fort Carson, Colorado. They lived in an off-post apartment on Sage Street in nearby Colorado Springs.

---

[1] Both Appellant and her husband served in the grade of Sergeant. The opinion will refer to Appellant's husband as SGT Dobson.

3

During the early morning hours of March 2, 1999, SGT Dobson died in the middle of Sage Street, near his truck, as a result of multiple knife wounds.

The defense has maintained, both at trial and on appeal, that Appellant killed SGT Dobson in self-defense. The defense further contends that the evidence did not demonstrate intent to commit premeditated murder.

A. EYEWITNESS TESTIMONY AND FORENSIC EVIDENCE

At trial, the prosecution presented three witnesses who observed portions of the events on Sage Street that immediately preceded SGT Dobson's death. Each observed an altercation that was already in process. At the point in time where the witnesses first observed the fight, SGT Dobson was already staggering, apparently injured, and he had difficulty staying on his feet. The witnesses heard him plead for help and beg the other person to stop. The witnesses variously heard a voice say: "Shut up, Terry" and "Get up. Nobody's gonna . . . ." Two of the witnesses testified that SGT Dobson either dropped or was pushed to the ground. The person holding the knife then stabbed him numerous times in the chest and head, holding the knife with two hands. One witness also stated that the person using the knife cut SGT Dobson methodically in a slicing fashion.

The eyewitnesses described the person who used the knife as the aggressor, acting in a controlled, deliberate fashion. They added that SGT Dobson did not act in an aggressive or threatening manner during the time that they observed the fight, and that he attempted, ineffectually, to ward off the blows with his hands. One of the witnesses testified that after SGT Dobson ceased moving, the person who had used the knife took off her sweatpants and quickly left the area.

The eyewitnesses did not see the beginning of the incident, nor did they offer any explanation as to the cause of the fight. The witnesses did not observe who struck the first blow or how the affray escalated into the use of deadly force.

The prosecution introduced detailed forensic evidence involving analysis of the wounds, blood spatters and trails, body position, and clothing. The forensic evidence indicated that the movements described by the eyewitnesses and the nature of SGT Dobson's wounds were consistent with defensive action on his part. A forensic pathologist indicated that SGT Dobson suffered over 100 wounds, including over twenty stab wounds in the head, and that a piece of a knife was imbedded in his skull. According to the forensic pathologist, SGT Dobson suffered over twenty "defensive" wounds to his hands. The forensic evidence also indicated that wounds on Appellant's hands were superficial and were not inflicted during the altercation with the knife.

5

B. APPELLANT'S TESTIMONY ABOUT THE DEATH OF SGT DOBSON

Appellant, who testified at trial in her own behalf, could not recall what brought her and SGT Dobson out onto Sage Street in the middle of the night.

> I remember being out at the truck with Terry. I don't remember walking to the truck or anything like that, but I remember being at the truck.

She did not recall stabbing SGT Dobson, nor did she have any recollection as to how he died. When asked whether she remembered "anything," she testified:

> I remember being scared. I remember being frightened. Terry . . . told me point blank, "It's me or you now that -- it's me or you now, Bitch. One of us has to die."

Defense counsel then asked: "Do you remember why he said this?"

Appellant responded:

> I don't know what -- I can't -- I can't recall everything --
>
> . . . .
>
> I don't know why. I mean, Terry . . . had a knife, and I know it was on the ground in between us. And while we were standing there with the knife between us, I remember looking at him. And the way Terry looked, he didn't look like Terry. There was nothing about him that was Terry. His demeanor, his expression, everything was different. Everything about him was pronounced and scary. And while the knife was between us, that's what he told me, that it was me or him. "It's me or you now, Bitch."

6

> . . . .
>
> And I believed . . . him.
>
> . . . .
>
> I did not feel that Terry was just trying to
> say something to just scare me. I did not
> believe he was just trying to control me. I
> did not believe that he was just angry. I
> believed that he meant exactly what he said.
> And while . . . he said it and we were
> looking at each other, I was -- I thought I
> was going to die. I believed it.

Defense counsel returned to the subject of the knife, asking: "Do you remember how the knife got in between the two of you?" Appellant testified:

> I know Terry had it, and we struggled. And
> it was dropped. He lost his grip.

In response to defense counsel's inquiry as to "what happened with the knife next," Appellant said:

> I remember Terry -- at one point, Terry had
> the knife, and he lunged at me, but I was
> able to . . . move out of the way. But I --
> it's -- there's a lot that I just cannot put
> together or that I -- I can't recall.

Defense counsel provided Appellant with an opportunity to "recall anything that happened with the knife after that." Appellant testified that she wanted to get the knife away from her husband. She later stated that she remembered "us both lunging towards the knife."

Appellant testified that she had no recollection of stabbing her husband:

> I know that I felt like if I could get it
> away from him, then he would stop coming for
> me, that he wouldn't hurt me anymore.  But I
> don't -- I just don't remember stabbing
> Terry.  I don't remember cutting Terry.  I
> don't remember hurting Terry.

### C.   FABRICATIONS, DECEPTIONS, AND OMISSIONS

Through the testimony of witnesses and presentation of extensive documentation, the prosecution introduced detailed evidence showing that in the immediate aftermath of the incident and during subsequent examinations, Appellant made numerous inconsistent, misleading, and false statements to medical personnel, law enforcement officials, and psychologists in an effort to deflect attention from herself and cast blame on others.  Her fabrications included an effort to blame SGT Dobson's death on a fictitious person named "Debra," and she generated a series of anonymous letters corroborating her false statements.  Appellant acknowledged at trial that many of her pretrial statements were false, including statements to law enforcement authorities, friends, relatives, and the psychologist retained by the defense.  When questioned about numerous other inconsistencies, she offered either no recollection or no explanation.

### D.   THE DEFENSE EXPLANATION FOR APPELLANT'S BEHAVIOR DURING AND AFTER THE DEATH OF SGT DOBSON

The defense theory at trial was that Appellant was an abused spouse whose actions during and after the night of the

killing were consistent with battered woman's syndrome. Appellant testified that she had been abused as a child by her father, that as a teenager she was raped by a stranger, and that SGT Dobson physically and verbally abused her. Appellant testified that SGT Dobson first threatened her during her pregnancy. In midst of an argument, "[h]e told me that he would stomp the oblivion out of me and the babies inside me." She stated that she felt "scared" and attempted, unsuccessfully, to seek help from his unit. While she was on the phone, he pressed his hands against her head, pushed her head "violently," and threatened to kill her if she interfered with his career. She then called 911, and he left the house. She also called her brother, and both the police and her brother came to the house.

On cross-examination, the prosecution asked her to "repeat about that 911 call, what that was all about." In response to trial counsel's question, Appellant told the panel:

> First I tried to call Terry's unit, but I couldn't get a hold of anybody. I couldn't get a hold of the unit. Then after Terry threatened me and putting his fingers up against my head and pushing my head violently and telling me that if I did anything to hurt his career that he would "f---ing kill me," I called 911, and I told him "I'm calling 911." And when I told him I was calling 911, Terry left. After I called -- I did call 911, and I also called my brother. My brother beat 911 there, and then the police officer came.

Trial counsel then said:

9

> And that's a pretty significant report;
> would you agree?  That's pretty significant,
> what he did; would you agree?

Appellant agreed.  Trial counsel then engaged in a lengthy cross-examination based upon the notes taken by Dr. Brill, the psychologist who examined Appellant on behalf of the defense. The questioning was designed to characterize Appellant's testimony at the court-martial as an exaggeration of the 911 incident.  Trial counsel suggested through his questions that in discussing the 911 incident with Dr. Brill, Appellant had not described any threats, and that it was merely an overreaction to an insignificant dispute about cleaning kitchen dishes.

The 911 incident occurred more than a year prior to SGT Dobson's death.  Appellant described another incident, from that period, in which SGT Dobson pushed her and caused her to fall down some stairs.  Appellant then depicted an escalating pattern of verbal abuse, threats, and physical abuse, including incidents in which he squeezed her throat.

According to Appellant, the situation deteriorated significantly in the days before SGT Dobson's death.  She testified that she told him that she was going to leave, "get help," and "tell someone what was going on."  He responded that if she were to discuss her concerns with anyone, she would never see her children again.  She added:  "He told me that he would whip my ass, that he'd kick my ass."  When asked if she feared

that he would act on his threats, she responded affirmatively, noting that she believed his threats because his behavior was markedly worse since he returned from the Basic Noncommissioned Officer course. She testified that on the evening prior to SGT Dobson's death, he had forced her to perform an act of oral sex while he read a biblical verse.

Through expert witnesses, the defense sought to explain Appellant's actions on the night of SGT Dobson's death, as well as her subsequent problems of memory loss, inconsistent statements, and fabrications, as consistent with the behavior of a victim of spousal abuse acting in self-defense. This evidence, and the prosecution's evidence in rebuttal, is considered in Section III, infra. The defense also sought to introduce the testimony of two witnesses who would have corroborated portions of Appellant's testimony regarding spousal abuse. In Section IV, infra, we consider the proposed testimony of the two witnesses and the related rulings by the military judge.

## II. COMPOSITION OF THE COURT-MARTIAL PANEL (ISSUE I)

### A. PANEL MEMBERSHIP REQUIREMENTS

Appellant was tried by a general court-martial panel composed of officer and enlisted members. A general court-martial panel consists of "not less than five members" appointed

by the convening authority.  Articles 16, 22, UCMJ, 10 U.S.C. §§ 816, 822 (2000).  If an enlisted accused requests that the panel include enlisted members, "the accused may not be tried by a general or special court-martial the membership of which does not include enlisted members in a number comprising at least one-third of the total membership of the court," subject to an exception for physical conditions or military exigencies.  Article 25(c), UCMJ, 10 U.S.C. § 825(c) (2000).

Whenever a general court-martial panel "is reduced below five members, the trial may not proceed unless the convening authority details new members sufficient in number to provide not less than five members."  Article 29(b), UCMJ, 10 U.S.C. § 829(b) (2000).  The prohibition against proceeding, however, is subject to the procedure for making and ruling on challenges under Article 41, UCMJ, 10 U.S.C. § 841 (2000).

Article 41 authorizes challenges for cause and permits each party to exercise one peremptory challenge.  Article 41 contains specific guidance on how to proceed when challenges reduce a court-martial below the minimum composition requirements of Article 16.  Article 41(a)(2) provides:

> If exercise of a challenge for cause reduces the court below the minimum number of members required by . . . [Article 16], all parties shall (notwithstanding . . . [Article 29]) either exercise or waive any challenge for cause then apparent against the remaining members of the court before

12

> additional members are detailed to the
> court.  However, peremptory challenges shall
> not be exercised at that time.

Article 41(b)(2) provides:

> If exercise of a peremptory challenge
> reduces the court below the minimum number
> of members required by . . . [Article 16],
> the parties shall (notwithstanding . . .
> [Article 29]) either exercise or waive any
> remaining peremptory challenge (not
> previously waived) against the remaining
> members of the court before additional
> members are detailed to the court.

Article 41(c) provides for additional challenges when members

are added to a court-martial:

> Whenever additional members are detailed to
> the court, and after any challenges for
> cause against such additional members are
> presented and decided, each accused and the
> trial counsel are entitled to one peremptory
> challenge against members not previously
> subject to peremptory challenge.

B. THE COMPOSITION AND RECONSTITUTION OF APPELLANT'S PANEL

Upon Appellant's request for a panel with enlisted

membership, the convening authority detailed ten members -- six

officers and four enlisted personnel -- to serve on the court-

martial.  After the military judge ruled on challenges for

cause, the panel membership was reduced to seven, including five

officers and two enlisted personnel.  As such, the panel

satisfied the total composition requirement of a general court-

martial under Article 16, but the enlisted representation was

short of the one-third minimum enlisted requirement under Article 25.[2]

The prosecution then exercised a peremptory challenge against an enlisted member and the defense exercised a peremptory challenge against an officer, leaving the panel with a total of five members, including four officers and one enlisted person. The military judge, on his own motion, decided to reconsider whether he should have allowed the parties to exercise peremptory challenges after the completion of challenges for cause in view of the reduction below the required enlisted representation. After considering the matter, he adhered to his original decision. He noted that the plain language of Article 41(a)(2) precluded peremptory challenges only when causal challenges reduced the total composition of the panel to a number below requirements of Article 16, and that the plain language did not address reductions in enlisted representation. He concluded that Article 41(a)(2) did not preclude peremptory challenges when the total panel composition satisfied Article 16, even if the enlisted representation fell below the minimum required by Article 25. Both parties agreed with the military judge's interpretation.

---

[2] The changes in the composition of the panel discussed in this section are summarized in the table at ___ M.J. ___ (17).

At that point, the military judge observed that the convening authority would need to appoint additional members in view of the shortfall in enlisted representation.  He added that the new members would be subject to challenge for cause, and noted that each party would be entitled to one additional peremptory challenge against the new members under Article 41(c).  Both parties agreed.  Five additional members were added to the panel, including two officers and three enlisted members.  Defense counsel inquired as to why officers had been added when the only problem was a shortfall of enlisted members, but he did not raise an objection.  The military judge observed that he knew of no legal prohibition, and the defense did not offer any further views.

The panel now consisted of ten members, including six officers and four enlisted members.  After challenges for cause were granted against two of the new enlisted members, the panel was reduced to eight members, including six officers and two enlisted members.  The military judge reminded the parties that the challenges had produced the same situation that occurred earlier in the trial.  The total composition of the panel met the minimum requirement for a general court-martial under Article 16, but the enlisted representation fell short of the minimum one-third requirement under Article 25.

The military judge noted that he and the parties had agreed earlier in the trial that so long as the panel met the total composition requirement of Article 16, both sides could exercise peremptory challenges. He expressly asked the defense counsel to reaffirm the defense position, and defense counsel agreed with the reading of Article 41 articulated by the military judge. The prosecution exercised one peremptory challenge against an officer, and the defense declined to offer a peremptory challenge.

The panel now had seven members, including five officers and two enlisted personnel. In view of the shortfall of enlisted representation under Article 25, three more enlisted members were detailed. After voir dire, both parties joined in a challenge for cause against one of these new enlisted members, which was granted. The prosecution then peremptorily challenged one of the new enlisted members, and the defense declined to offer a peremptory challenge.

As a result of the series of challenges and replacements, the panel consisted of eight members, including five officers and three enlisted members. As such, the composition of the panel met the minimum total requirement of Article 16 and the minimum enlisted requirement of Article 25. The following table summarizes the actions taken in the course of forming the panel:

16

| Panel Composition | Total | Officer | Enlisted |
|---|---|---|---|
| Initial | 10 | 6 | 4 |
| After 1st causal challenges | 7 | 5 | 2 |
| After 1st peremptory challenges | 5 | 4 | 1 |
| After 1st additions | 10 | 6 | 4 |
| After 2nd causal challenges | 8 | 6 | 2 |
| After 2nd peremptory challenges | 7 | 5 | 2 |
| After 2nd additions | 10 | 5 | 5 |
| After 3rd causal challenges | 9 | 5 | 4 |
| Final (after 3rd peremptory challenges) | 8 | 5 | 3 |

C. DISCUSSION

1.  Timing of peremptory challenges

At trial, the military judge stated that the parties could exercise peremptory challenges so long as the panel contained sufficient members to meet the total composition requirements of a general court-martial under Article 16, even if the proportion of enlisted members fell below the one-third representation requirement of Article 25. Defense counsel agreed. In this appeal, however, Appellant asserts that when enlisted representation falls below one-third, no peremptory challenges may be exercised until the convening authority appoints additional members.

The military judge relied on the plain language of Article 41. Under Article 41(a)(2), when challenges for cause reduce panel membership below the minimum total number of members required under Article 16, the military judge is not required to halt the proceedings until new members are appointed. Instead,

17

the parties proceed with any remaining challenges for cause "before additional members are detailed" to serve on the panel. The rule then provides that "peremptory challenges shall not be exercised at that time." There is no mention in the statute of applying a similar procedure when the total number is adequate under Article 16 but the percentage of enlisted membership is deficient under Article 25.

Appellant relies on the Rule for Courts-Martial (R.C.M.) 912(g)(2) Discussion in the Manual for Courts-Martial United States (MCM) (1998 ed.), which states: "When the membership of the court-martial has been reduced below a quorum (see R.C.M. 501) or, when enlisted members have been requested, the fraction of enlisted members has been reduced below one-third, the proceedings should be adjourned and the convening authority notified so that new members may be detailed." We do not view this provision as mandating a halt in proceedings prior to further action on challenges.

At the outset, we note that the language appears in the nonbinding Discussion, not in the rule. Use of the word "should" suggests a recommendation, rather than a command, particularly in the absence of direct precedent in our case law. Moreover, the Discussion does not expressly prohibit the exercise of either a causal or peremptory challenge before new members are detailed. This is understandable, because such a

18

prohibition would be contrary to Article 41(a)(2), which requires the parties to complete causal challenges even though the total membership has fallen below quorum under Article 16. It also would be contrary to Article 41(b)(2), which requires the parties to exercise any remaining peremptory challenges if the peremptory challenge by one party has reduced the panel below the minimum required under Article 16.

In Article 41, Congress has made specific choices as to when challenges should continue after a quorum is lost under Article 16, and when challenges should be deferred pending appointment of new members. Congress has not applied such limitations to a change in composition that affects enlisted representation under Article 25.

There is a rational basis for distinguishing between a deficit under Article 16 and a deficit under Article 25. The quorum requirement for a general court-martial under Article 16 involves an absolute number -- there must be at least five members. Once membership drops below the total required by Article 16, new members will have to be detailed regardless of the exercise of peremptory challenges. By contrast, the enlisted representation requirement in Article 25 employs a percentage, not an absolute number. As a result, there are circumstances in which an enlisted representation deficit under Article 25 can be corrected through exercise of a peremptory

19

challenge against an officer.  Because it is possible that exercise of a peremptory challenge could preclude the need for appointment of new members under Article 25, we do not view the omission of Article 25 from Article 41 as a drafting error or as otherwise warranting an interpretation of Article 41 to include Article 25.  Accordingly, we conclude that the military judge properly ruled that the composition of the court-martial under Article 25 is not a pertinent factor for purposes of determining the timing of peremptory challenges under Article 41.

## 2. The addition of officer members

When the panel fell below the required enlisted representation under Article 25, officers and enlisted members were added to the panel.  Appellant notes that this was done even though the size of the panel exceeded the minimum required for a general court-martial, and that the only deficit was in enlisted representation under Article 25.  According to Appellant, the addition of officers at this stage was improper under R.C.M. 505(c)(2)(B) (permitting additions when the total number of members has been reduced below quorum or the number of enlisted members has been reduced below one-third of the panel's membership).  Appellant acknowledges that the rule does not expressly prohibit the action taken by the convening authority here, but contends that such action may unfairly dilute the right to enlisted representation.

At trial, defense counsel made an inquiry about this matter, but did not object. We need not consider whether this issue was waived, however, because there was no error. An enlisted accused who requests enlisted membership on the panel under Article 25(c)(1) is entitled by the statute only to a minimum proportion -- "at least one-third of the total membership of the court." R.C.M. 505(c)(2)(B) limits the circumstances under which a convening authority may add members to the panel, but it does not require the authority to add only the minimum number and type necessary to address any deficit under Articles 16 or 25. Neither the statute nor the rule entitles an enlisted accused to maintain the proportion of officer and enlisted members that was contained in the initial convening order or at any other point during trial.

III. ASSISTANCE OF COUNSEL (ISSUE II)

Appellant contends that she was denied effective assistance of counsel under the Sixth Amendment because of deficiencies in her counsel's approach to various mental health issues related to her defense to the charge of premeditated murder. In this section, we note the applicable standard of review, briefly discuss the relationship between mental health and self-defense, describe the pretrial evaluations of Appellant, summarize

pertinent trial testimony, and analyze Appellant's claims regarding the assistance of counsel.

## A. STANDARD OF REVIEW

The right to counsel under the Sixth Amendment includes the right to the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984); see also United States v. Scott, 24 M.J. 186, 187-88 (C.M.A. 1987). We review allegations of ineffective assistance of counsel de novo. United States v. Wean, 45 M.J. 461, 463 (C.A.A.F. 1997).

"On appellate review, there is a 'strong presumption' that counsel was competent." United States v. Grigoruk, 56 M.J. 304, 306-07 (C.A.A.F. 2002) (citing Strickland, 466 U.S. at 689). A servicemember "who seeks to relitigate a trial by claiming ineffective assistance of counsel must surmount a very high hurdle." United States v. Moulton, 47 M.J. 227, 229 (C.A.A.F. 1997).

Under the first prong of Strickland, which examines the issue of deficiency in performance, we ask: (A) Are appellant's allegations true? (B) If so, is there a reasonable explanation for counsel's actions? (C) If there is not a reasonable explanation, did defense counsel's level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers? See Grigoruk, 56 M.J. at 307 (citing United States v. Polk, 32 M.J. 150, 153 (C.M.A. 1991)).

22

Even if counsel's performance was deficient, the defense must surmount the second prong of Strickland, which measures prejudice. The defense bears the burden of demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694.

The second prong is critical because, "[i]f we conclude that any error would not have been prejudicial under the second prong of Strickland, we need not ascertain the validity of the allegations or grade the quality of counsel's performance under the first prong." United States v. Saintaude, 61 M.J. 175, 179-80 (C.A.A.F. 2005).

## B. MENTAL HEALTH AND SELF-DEFENSE

Appellant's contention that she was denied effective assistance of counsel under the Sixth Amendment pertains primarily to the relationship between her mental health and her claims of self-defense. R.C.M. 916(e)(1) provides:

> It is a defense to a homicide . . . that the accused:
>
> (A) Apprehended, on reasonable grounds, that death or grievous bodily harm was about to be inflicted wrongfully on the accused; and
>
> (B) Believed that the force the accused used was necessary for protection against death or grievous bodily harm.

23

The first element, under subparagraph (A), has an objective component, involving the perception of a reasonable person under the circumstances. The second element, under subparagraph (B), is wholly subjective, involving the personal belief of the accused, even if not objectively reasonable. Although mental health evaluations may be relevant to both elements of self-defense, such evaluations may have particular import with respect to the second element, which involves the personal, subjective perceptions of the accused.

C. PRETRIAL MENTAL HEALTH EVALUATIONS OF APPELLANT

Appellant's multiple claims of ineffective assistance of counsel concern the actions taken by trial defense counsel with respect to the various examinations of Appellant's mental health that were conducted in the aftermath of SGT Dobson's death.

1. The first mental health evaluation by Doctor Bissell and Doctor Paliani

On March 4, 1999, two days after SGT Dobson's death, the Military Police (MPs) became concerned about Appellant's behavior and potential to commit suicide in pretrial confinement. The MPs brought her to the mental health clinic, where she was interviewed by Dr. William Bissell, the chief of psychiatric services at the clinic, and Dr. Melissa Paliani, a clinical psychologist who was the chief of mental health care services. Dr. Bissell observed that Appellant generally was

coherent and that she exhibited occasional amnesia and mild anxiety. He concluded that although she met the criteria for acute stress disorder with disassociative amnesia, he could not rule out a diagnosis of malingering -- fabricating a mental state in order to avoid responsibility. He did not administer or interpret any psychological tests at that time.

2.   The R.C.M. 706 Board

Both parties subsequently requested a formal inquiry under R.C.M. 706 to determine whether Appellant lacked mental responsibility for SGT Dobson's death or whether she lacked the mental capacity to stand trial. The R.C.M. 706 Board, which included a psychiatrist and a clinical psychologist, issued its report on August 16, 1999. The Board concluded that she did not lack mental responsibility for the offense, see R.C.M. 916(k), and that she was competent to stand trial. See R.C.M. 909(a). Appellant did not challenge the Board's conclusions at trial, and the conclusions are not at issue in the present appeal.

Although the Board did not provide Appellant with a basis for claiming a lack of mental responsibility, the Board's report stated that the evaluation indicated that Appellant appeared "to have several personality factors that may have influenced her behavior on the night of the incident in question," specifically noting the impact of spousal abuse on her perceptions of a threat prior to the death of SGT Dobson. After noting that

25

"some of the issues facing this defendant lie outside the area of expertise of the Board members," the report "recommended that outside experts within these areas be allowed to examine the defendant to more completely comment on her state of mind at the time of the offense."  The report added:  "Locally, Diane Shelton, Ph.D. . . . has the experience and expertise in this area," and included Dr. Shelton's phone number.

### 3.  Dr. Brill's evaluation

After the R.C.M. 706 Board completed its report, Appellant was examined by Dr. Alice Brill, a licensed psychologist retained by the defense.  Dr. Brill conducted five examinations of Appellant beginning on August 28, 1999.  She concluded that Appellant suffered from battered woman's syndrome and post-traumatic stress disorder (PTSD).

### 4.  Further evaluation by Dr. Bissell

On December 29, 1999, personnel at the confinement facility became concerned that Appellant's behavior indicated a suicide risk, and they brought her to the mental health clinic.  At that time, she was again examined by Dr. Bissell.  He concluded that she was not suffering from either PTSD or acute anxiety disorder, but that she met the criteria for adjustment disorder with mixed emotions of depression and anxiety.  A week later, Dr. Bissell received a call from Dr. Brill, who expressed concern that Appellant was psychotic.  Dr. Bissell said that if

defense counsel submitted a request, he would conduct a further examination of Appellant.

After defense counsel made the arrangements, Dr. Bissell evaluated Appellant on January 9, 2000. At the examination, Appellant provided Dr. Bissell with the same information that she had described in her prior examinations, and he once again concluded that she did not suffer from PTSD or any other serious psychiatric illness. Dr. Bissell's evaluations were based upon his interviews with Appellant. He did not conduct or evaluate any psychological tests during his three meetings with Appellant.

## D. TRIAL TESTIMONY

### 1. The Defense Case Concerning Appellant's Mental Health

The defense presented the testimony of Ms. Janet Kerr, Executive Director of the Center for the Prevention of Domestic Violence, to explain the concepts of battered woman's syndrome, PTSD, and disassociation. Ms. Kerr, who was qualified as an expert, specifically addressed the relationship between spousal abuse and self-defense. Ms. Kerr, who had not examined Appellant, set the stage for the testimony of Dr. Brill, who had evaluated Appellant.

Dr. Brill, who was qualified as an expert, testified that she conducted a number of interviews with Appellant and administered a series of different psychological tests,

including the Minnesota Multiphasic Personality Inventory I (MMPI-I). For each test, she provided an explanation of the methodology and results.

Based on the tests and her evaluation, Dr. Brill diagnosed Appellant as suffering from PTSD. She opined that Appellant's behavior on the night of SGT Dobson's death reflected a person acting in fear of her life, and that her subsequent inconsistencies reflected the behavior of an abused person.

2. The prosecution's critique of Dr. Brill's testimony

Dr. Bissell, who had examined Appellant for mental health problems during her pretrial confinement, testified at trial as a prosecution witness in rebuttal. He stated that during his examinations of Appellant, she had not described herself as a battered spouse, and that he could recall her recounting only one incident of abuse. He also testified that the term "battered spouse syndrome" was not a recognized diagnosis because it was "very simplistic" and did not "describe anything that's clinically meaningful." According to Dr. Bissell, Appellant suffered from stress and sleep disorder, but not PTSD. He disagreed with Dr. Brill's assessment of Appellant as suffering from PTSD or another psychotic condition. He also stated that he did not believe it was possible to determine, months after the event, what Appellant's mental state had been at the time she killed SGT Dobson. Dr. Bissell testified that

Appellant's behavior reflected a pattern of self-serving statements, intermittent memory lapses, and fabrications that were "more consistent with malingering than any other diagnoses [sic]." Dr. Bissell criticized Dr. Brill's use of the MMPI-I test on the grounds that it was outdated and had been replaced by the MMPI-II test.

During cross-examination by the defense, Dr. Bissell acknowledged that in his position, he was not responsible for administering or interpreting psychological tests. He also stated that his evaluations were conducted for the purpose of determining whether Appellant had presented any suicidal tendencies during pretrial confinement, and whether treatment was necessary. He did not evaluate her for purposes of assessing her state of mind on the date of SGT Dobson's death.

The prosecution sought to bolster its critique of Dr. Brill's testimony through the testimony of Dr. Paliani. Dr. Paliani, who had reviewed the psychological tests that Dr. Brill had performed on Appellant, criticized Dr. Brill's use of the MMPI-I test as outdated. She also stated that it was unethical to use such a test under standards of the American Psychological Association. In addition, Dr. Paliani identified various mathematical errors committed by Dr. Brill in the course of her analysis of Appellant.

### 3. Dr. Brill's response

In response to the testimony from Doctors Bissell and Paliani, the defense recalled Dr. Brill.  She testified that she was experienced in using both the MMPI-I and MMPI-II and that the differences between the two were not significant.  She also stated that the MMPI-I remained valid as an analytical tool. She added that any mathematical errors reflected minor clerical mistakes that did not affect the substance of her evaluation of Appellant.

E.  APPELLATE ISSUES CONCERNING THE ASSISTANCE OF COUNSEL

In the present appeal, Appellant submits four separate claims alleging constitutionally defective representation by the trial defense team.

### 1. Defense counsel's reliance upon Dr. Brill

Appellant contends that defense counsel should not have presented the testimony of Dr. Brill, whose evaluation was vulnerable because she used an outdated and inappropriate test, committed computational errors in scoring the tests, and relied on outdated scoring methods.  Although Dr. Brill was a vulnerable witness, Appellant does not detail a specific alternative approach that should have been taken by the trial defense team.  It is not apparent whether Appellant believes that it would have been better to:  (a) present no testimony on

this subject; (b) obtain a different witness; or (c) somehow improve the quality of Dr. Brill's testimony.

In view of the strong case presented by the prosecution during its case-in-chief, testimony about Appellant's psychological state on the night of SGT Dobson's death and afterwards was an important component of the defense case. Dr. Brill presented exculpatory expert testimony supportive of Appellant's claim of self-defense, both in terms of Appellant's role in SGT Dobson's death, and in explaining her subsequent fabrications, inconsistencies, and memory lapses. In that context, Appellant was not prejudiced by presenting Dr. Brill's testimony, as opposed to presenting no evidence on this subject.

In terms of an using an alternative witness, Appellant has not demonstrated what an alternative witness could have done that Dr. Brill did not do in addressing Appellant's behavior on the night of SGT Dobson's death and Appellant's subsequent behavior. Finally, although the defense might have marginally enhanced the quality of Dr. Brill's testimony by using the initial direct examination to anticipate and rebut the critiques offered by the prosecution's experts, such tactics would not have eliminated either the critiques or Dr. Brill's rebuttal from consideration by the panel. Accordingly, Appellant has not demonstrated a reasonable probability that a different approach would have produced outcome-altering testimony. See Grigoruk,

56 M.J. at 307-08.  In the absence of such a showing, Appellant has not met the defense's burden of demonstrating prejudice under the second prong of Strickland.

2.  Dr. Shelton

Appellant faults the trial defense team because the record does not reflect that they pursued the recommendation of the R.C.M. 706 Board to contact Dr. Shelton, an expert on domestic violence and female offenders.  Assuming that the defense did not contact Dr. Shelton, and that this was a deficiency, Appellant has not demonstrated prejudice.  Even if Dr. Shelton could have provided favorable background information about the various psychological concepts at issue, Appellant has not identified any outcome-altering difference between what she would have offered and the background testimony presented by Ms. Kerr, who testified as an expert witness for the defense.

With respect to the vulnerabilities in the testimony of Dr. Brill, the burden is on Appellant to demonstrate that an evaluation of Appellant by Dr. Shelton would have reached similarly favorable conclusions about Appellant's behavior on the night of SGT Dobson's death and about her subsequent behavior.  There has been no such showing.  Under these circumstances, Appellant has not demonstrated prejudice under the second prong of Strickland.

3.  The R.C.M. 706 Board

Appellant asserts that the trial defense team was ineffective for not calling members of the R.C.M. 706 board to testify at trial.  According to Appellant, this testimony would have been helpful in a number of respects on findings and sentence, including serving to rebut Dr. Bissell's suggestion that Appellant was malingering and showing that Appellant suffered from a post-traumatic reaction.

Testimony by the Board members, however, would have carried significant risks for the defense.  The Board, for example, administered the MMPI-II test, but did not conclude that Appellant was suffering from PTSD -- the centerpiece of the defense case.  The Board also expressly noted that its members did not have expertise in the other key aspect of the defense case -- battered woman's syndrome.  Moreover, much of the Board report was based upon information provided by Appellant, including information that she later acknowledged to be false.  Under these circumstances, the decision not to call the Board members as witnesses was well within the range of discretion afforded to defense counsel under the first prong of Strickland.

4.  Statements to Dr. Bissell

Appellant met with Dr. Bissell on three separate occasions to address mental health problems she encountered during pretrial confinement.  The meetings took place on March 4, 1999,

33

December 29, 1999, and January 9, 2000.  The last meeting was held at the request of Dr. Brill, and was facilitated by defense counsel.

Appellant notes that Dr. Bissell provided damaging testimony based upon his third evaluation of Appellant.  In particular, he testified that Appellant had not presented a pattern of being battered by her spouse; that he disagreed with Dr. Brill's assessment that she was psychotic and suffered from PTSD; and that her symptoms were more consistent with malingering than any other diagnosis.  Appellant contends that her trial defense team was ineffective for:  (1) not moving at trial to suppress her December 29 and January 9 statements; and (2) not ensuring that her statements during the January 9 meeting were treated as confidential before permitting her to meet with Dr. Bissell.

Appellant, who asserts that none of the statements were confidential under Military Rule of Evidence (M.R.E.) 513 (psychotherapist-patient privilege), does not identify the source of law that could have been invoked at trial to suppress her December 29 and January 9 statements to Dr. Bissell. Moreover, Appellant does not assert that Appellant's statements to Dr. Bissell on December 29 resulted from any defect on the part of counsel.

In any case, there was no prejudice from Dr. Bissell's reliance on statements made during the latter two examinations. Dr. Bissell testified that in his first evaluation of Appellant, he did not diagnose her as suffering from PTSD, and that there was the possibility of malingering. The information from the latter two evaluations confirmed his initial evaluation. Even if the results of the December 29 and January 9 evaluations had been excluded, Dr. Bissell would have provided adverse testimony covering much of the same matter. Although his testimony might have been somewhat less forceful if based only on his first evaluation, there is no reasonable probability that the panel, without the December 29 and January statements, would have had a reasonable doubt about Appellant's guilt. See United States v. Paaluhi, 54 M.J. 181, 185 (C.A.A.F. 2000).

5. Assistance of counsel -- conclusion

The prosecution presented a very strong case in terms of eyewitness testimony, forensic evidence, and numerous examples of Appellant's false, inconsistent, and incomplete statements. In view of both the strength of the prosecution's case and the nature of the errors alleged by Appellant, we conclude that the alleged errors, both individually and collectively, were not prejudicial under the second prong of Strickland.

IV.  EVIDENCE CONCERNING SPECIFIC INCIDENTS OF PRIOR ABUSE
(ISSUE III)

A.  TRIAL PROCEEDINGS

1. Specific Instances of Prior Abuse Discussed by Both Parties
in the Opening Statements

The prosecution, in its opening statement, told the members that premeditation could be inferred from Appellant's acts before, during, and after the killing of SGT Dobson.  With respect to events before the killing from which intent could be inferred, the prosecution noted that the couple had argued over possessions, infidelity, a possible divorce, and custody of their infant twin daughters.  Defense counsel's opening statement also focused on the impact of prior events on Appellant's intent.  According to defense counsel, SGT Dobson's abuse of Appellant had created a situation in which she "was desperate and felt she had no other alternative."

Defense counsel told the panel that Appellant would testify about incidents of mental cruelty and physical abuse inflicted by SGT Dobson from 1997 through 1999.  Defense counsel also advised the panel that two separate witnesses would confirm her testimony.  The first witness would be a friend who was talking to Appellant on the phone and "heard Sergeant Terry Dobson threaten to kill her and heard the phone go dead."  The second witness would corroborate a 911 call Appellant made after SGT Dobson had threatened her and she was in "fear for her safety."

Defense counsel stated that these incidents, along with others, would demonstrate that Appellant acted out of fear for her safety on the night SGT Dobson was killed.

2. Exclusion of Ms. Waddell's specific incident testimony

During the trial on the merits, defense counsel proffered the stipulated testimony of Karen Waddell, including testimony concerning the phone conversation that had been described by defense counsel in his opening statement. In the stipulated testimony, Waddell stated that she overheard SGT Dobson threaten to kill Appellant, and then the phone went dead.

When the military judge inquired as to the basis for admitting this testimony, defense counsel offered two grounds: first, the testimony would prove that the victim had a character trait to be a violent person, which would be relevant to self-defense; and second, the evidence would be relevant to show Appellant's state of mind. The military judge focused on the first ground -- the character trait of the victim -- and ruled that the testimony was inadmissible. In support of the ruling, the military judge cited the rules of evidence concerning proof of character traits. See M.R.E. 404(a)(2) (evidence of a pertinent character trait of a victim); M.R.E. 405(a) (when a character trait is at issue, it may be proved by reputation or opinion testimony); M.R.E. 405(b) (specific instances of a person's conduct may be introduced if the person's character or

trait of character is an "essential element" of an offense or defense). The military judge added that SGT Dobson's character for peacefulness was not an "essential element" of Appellant's claim of self-defense, citing United States v. Keiser, 57 F.3d 847 (9th Cir. 1995) (holding that although the victim's character for violence could be proved by opinion or reputation evidence, a third party's testimony as to specific acts by the defendant was not admissible because the character trait for violence was not an "essential element" of the self-defense claim). See R.C.M. 916 (setting forth the two elements of self-defense: (1) that the accused reasonably believe that death or grievous bodily harm is about to be inflicted; and (2) that the accused believe that the force used was necessary for protection against death or grievous bodily harm). The military judge did not address the question of whether evidence of specific acts of violence known to Appellant were admissible on the issue of Appellant's intent.

3. Specific incidents of prior abuse admitted into evidence

During her testimony on the merits, Appellant described specific instances of violent conduct by SGT Dobson, including threats and acts of physical abuse. Her testimony included the incident, noted in defense counsel's opening statement, in which Appellant had placed a 911 call to the police. According to Appellant, the incident occurred during her pregnancy. She

testified that SGT Dobson "told me that he would stomp the oblivion out of me and the [twin] babies inside of me." She added that she was "scared" and picked up the phone to call his unit. SGT Dobson pressed his fingers against her head and told her that he would kill her if she interfered with his military career. When she responded by calling 911, SGT Dobson left the premises, and she called her brother. Both the police and her brother came to the apartment, and she decided to spend the night with her brother "just in case" SGT Dobson returned.

Appellant also described a separate incident in which she was talking on the phone with a friend. SGT Dobson threatened to kill her if she did not get off the phone, and he then grabbed the phone from her and hung it up.

Appellant testified without objection by the prosecution to the evidence of specific acts of violence by SGT Dobson. On cross-examination, trial counsel emphasized that the 911 call was "significant." The prosecution sought to discredit her testimony by suggesting that in her pretrial sessions with Dr. Brill, Appellant treated the incident as insignificant. The prosecution pursued a similar line of inquiry during cross-examination of Dr. Brill, focusing the panel on "inconsistencies" and "lies" in what Appellant told Dr. Brill -- including differences between her in-court testimony and her pretrial statements to Dr. Brill about the 911 call. Through

the cross-examination, the prosecution expressly sought to challenge Dr. Brill's testimony "that the accused could not form the intent to murder." On redirect examination, Dr. Brill testified, without objection, that Appellant told her that she had made the 911 call after SGT Dobson "threatened to kill her."

4. Exclusion of Sergeant First Class Johnson's specific incident testimony

After Dr. Brill completed her testimony, the defense attempted to call as a witness Sergeant First Class (SFC) Lester Johnson, Appellant's brother. The prosecution requested a session pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), for the purpose of objecting to testimony from SFC Johnson about the 911 call. Defense counsel proffered that SFC Johnson would testify that he received a phone call from Appellant. She was upset, he went to her apartment, the police arrived, and she told him that SGT Dobson had threatened her. Defense counsel indicated that SFC Johnson's testimony about Appellant's remarks to him would be admissible as a hearsay exception -- an excited utterance by Appellant. See M.R.E. 803(2). Trial counsel objected on the same grounds used to exclude the testimony of Ms. Waddell -- that a specific instance of conduct could not be used "to shed bad light on the victim's character."

At the Article 39(a) session, SFC Johnson stated that he had received a phone call from Appellant in which she "sounded real shaken-up, like . . . she had been crying . . . [i]t was a voice I had never heard her in that state before . . . ." He said that he immediately went to the apartment, arriving within minutes after receiving the call. At the apartment, Appellant "was kind of nervous like, shaken-up and looked as though she had been crying." Appellant told him that SGT Dobson "had been threatening her and talking about what he would do to her."

The prosecution then renewed its objection on the grounds that the defense was improperly trying to use a specific instance of conduct to portray SGT Dobson as having a character trait for issuing violent threats. According to the prosecution, the evidence, like the Waddell stipulation, was inadmissible under M.R.E. 405(a) because it improperly sought to prove a character trait through a specific instance of conduct when the trait was not an essential element of self-defense. Defense counsel responded that the evidence was not being offered solely as to SGT Dobson's character, but to rebut the prosecution's suggestion, through its cross-examination of Appellant, that she had fabricated her testimony concerning abuse by SGT Dobson. See M.R.E. 801(d)(1)(B). Defense counsel also stated that the testimony was addressed to a specific component of self-defense -- Appellant's state of mind. The

41

military judge rejected defense counsel's arguments by referring to his prior reliance on the Ninth Circuit's decision in Keiser, and by stating that the prosecution had not specifically challenged Appellant's testimony about the fact of the 911 call or why she had made the call. On that basis, the military judge granted the prosecution's objection to SFC Johnson's testimony. Following the military judge's ruling, the defense relied solely on the testimony of Appellant to establish the facts pertinent to the defense theory that she had been abused repeatedly by SGT Dobson.

5. Consideration of specific incidents during the closing statements

Defense counsel, in his closing statement, focused the attention of the members on both self-defense and the intent element of premeditated murder, as well as the intent elements of lesser included offenses. The defense theme was that Appellant "wasn't intending to kill Sergeant Terry Dobson. She was acting out of fear for her safety that night." The defense emphasized that Appellant's actions, and her subsequent inconsistencies, were the product of a cycle of abuse inflicted by SGT Dobson, specifically highlighting the incident of the 911 call.

Trial counsel's rebuttal attacked the credibility of Appellant's testimony that she had been abused by SGT Dobson:

> [T]he accused . . . [is] trying to
> manipulate you.  But she's failed.  She
> isn't satisfied with merely killing her
> husband in a most gruesome and brutal
> fashion that you could possible [sic]
> imagine.  She's not done with him yet.  Now
> she's trying to assassinate his character,
> as well.

The rebuttal emphasized the absence of corroboration for Appellant's testimony about abuse:

> Now, one of the things about the accused's
> defense is -- the thing that needs to just
> jump right out at you is the fact that it
> relies entirely upon her.  There is
> absolutely no corroboration for what she has
> tried to tell you or what she has tried to
> imply.

After noting that the testimony of Dr. Brill, the defense expert, was dependent entirely upon Appellant's pretrial statements, trial counsel said:

> You know that the accused lied to her, lied
> to the police, lied to fellow members of her
> unit.  Lies, lies, lies, lies.

Trial counsel then returned, for a second time, to the subject of corroboration:

> The defense is a sort of a combination of
> things here, I guess:  battered spouse
> syndrome, post-traumatic stress disorder,
> disassociativeness.  There's no evidence --
> other than the accused, there is no
> corroboration that there was any physical or
> mental abuse.

At that point, defense counsel objected on the grounds that the prosecution was shifting the burden of proof to the defense, and

the military judge reminded the members of his earlier instruction that the Government bears the burden of proof. Shortly thereafter, trial counsel, for the third time, emphasized the absence of corroborating evidence:

> There's no corroboration for the accused's claims that she was abused.

As trial counsel began to identify inconsistencies in Appellant's various pretrial and trial statements, defense counsel asked for an Article 39(a) session. In that session, defense counsel emphasized that it was improper for the prosecution to highlight a lack of corroboration, particularly in light of the Government's objection to the Waddell stipulation and testimony of SFC Johnson. The military judge said that it would be permissible for the prosecution to emphasize inconsistencies in her statements, but reminded trial counsel to refrain from saying that the defense had not presented any evidence.

When the trial resumed, the military judge again reminded the panel that the defense had no burden to produce any evidence. Trial counsel argued that the evidence demonstrated that Appellant's claims of abuse were fabricated:

> [Y]ou cannot rely on what she says. She has chosen to tell people all the time leading up till [sic] trial . . . "I was never mentally or physically abused." There's no cycle of violence in this case.

Trial counsel added that Appellant's statements:

> [are] not just inconsistencies. They're
> lies. She lies. She came in here and she
> lied to you. She told you that she was
> abused. But she told everybody else up
> until then that she had never been abused.

Later in the argument, when trial counsel referred to a chart that contained its list of "proven lies," the defense objected to a reference on the chart to the "911 call." In the ensuing Article 39(a) session, trial counsel said that the prosecution was focusing on the credibility of her statement as to the purpose of the call, rather than on the question of whether the call was made. Trial counsel asserted that there was an inconsistency between her trial testimony that she called because of abuse and Dr. Brill's notes indicating that she called because there had been an argument about washing the dishes. The military judge stated that he recalled the inconsistency between Appellant's testimony and Dr. Brill's version of Appellant's pretrial statements, and he ruled that it was permissible for prosecution to include the 911 call on its display of "proven lies" on the grounds that the record contained "different stories" as to why the call was made. On that basis, trial counsel told the members:

> She lied about why she made the 911 call
> when she was in Texas. On the stand, she
> says she made the 911 call because Terry put
> his fingers up to her head and pushed her
> head and threatened her.

Referring to Dr. Brill's notes, trial counsel then said:

> She told Dr. Brill, "I called 911. It was really pretty stupid," and she laughed. "We were just arguing over cleaning up, and he called me a bitch, so I called 911."

After the members returned a finding of guilty to the charge of premeditated murder, the prosecution asked the members to sentence Appellant to life without parole. Trial counsel's argument included an emphasis on Appellant's untruthfulness, noting: "Her entire defense was to trash her family and to trash her husband."

## B. DISCUSSION

### 1. Exclusion of the testimony

The defense theory of the case was that Appellant suffered a cycle of abuse from SGT Dobson, that the abuse had a direct impact on her state of mind at the time of SGT Dobson's death, and that her inconsistent statements thereafter were a by-product of the abuse. The prosecution theory was that Appellant committed premeditated murder and subsequently fabricated a tale of abuse to escape responsibility for her intentional acts.

In support of its theory, the defense presented evidence of numerous specific incidents of abuse by SGT Dobson. This evidence was introduced through Appellant's testimony, and through Dr. Brill's description of the information that she had obtained from Appellant in the course of making her

psychological evaluation.  The prosecution did not object to the evidence about the specific incidents, but instead sought to persuade the panel, through aggressive cross-examination of Appellant and Dr. Brill, that the testimony was not credible. In particular, the prosecution drew the attention of the panel to the 911 incident by asking Appellant to repeat her description of the incident during cross-examination.  In response, Appellant specifically referred to her brother's prompt response to the call.  Although Appellant's testimony described specific instances of abusive treatment of Appellant by SGT Dobson, the military judge ruled that Ms. Waddell and SFC Johnson could not provide similar testimony, relying primarily on the Ninth Circuit's opinion in Keiser.

We review the ruling on the admissibility of evidence under an abuse of discretion standard, under which we assess whether the military judge's findings of fact were clearly erroneous or whether the decision was influenced by an erroneous view of the law.  United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F. 1995).  The military judge erred in applying Keiser to the present case.  In Keiser, the defense sought to admit evidence of an incident that occurred after the charged crime, in which the alleged victim threatened a third party.  57 F.3d at 852. The court expressly noted that the defendant made "no claim on appeal that the incident . . . was relevant to his state of mind

at the time of the shooting or the reasonableness of his belief that force in self-defense was necessary." Id. at 853. In that context, the court noted that the character of the alleged victim for violence could be proved by reputation or opinion evidence for purposes of showing that he acted in conformity with that trait, but could not be proved by evidence of specific acts because the character trait is not an "essential element" of self-defense. Id. at 854-57 (including citations to Fed. R. Evid. 404(a) and Fed. R. Evid. 405(b)).

In relying on the "essential element" aspect of Keiser, the military judge did not address the relevance of the specific acts to Appellant's state of mind. As noted in several opinions issued by the same court of appeals prior to Appellant's trial, evidence of a victim's specific prior acts of violence known to the defendant may be admitted to show Appellant's state of mind at the time of the victim's death. United States v. James, 169 F.3d 1210 (9th Cir. 1999); United States v. Saenz, 179 F.3d 686 (9th Cir. 1999). Because the military judge applied an erroneous view of the law, we find that the exclusion of the stipulation of Ms. Waddell and the testimony of SFC Johnson was an abuse of discretion.

In the present appeal, the Government contends that even if the military judge erred in relying on Keiser, the testimony about specific acts was too remote in time to bear on

Appellant's state of mind at the time of SGT Dobson's death. At trial, however, the prosecution offered no objection to the detailed evidence of SGT Dobson's prior acts from the same period -- 1997 to 1998 -- introduced by the defense at trial. The time for objection to the relevance of such evidence was at trial, not on appeal.

With respect to SFC Johnson's testimony -- that Appellant told him that she made the 911 call because SGT Dobson threatened her -- the military judge also erred by ruling that the evidence was not admissible to rebut a claim of recent fabrication under M.R.E. 801(d)(1)(B). In the course of considering the prosecution's motion to preclude SFC Johnson's testimony, the military judge stated that the prosecution had not cast doubt on the content of Appellant's testimony regarding the substance of the 911 call. That statement by the military judge was clearly erroneous in light of the prosecution's cross-examination of both Appellant and Dr. Brill about the 911 call. The cross-examination was designed to discredit Appellant's statement that she made the call because she was threatened by SGT Dobson. It is noteworthy, in that regard, that the military judge -- in a different context -- had a different recollection of the state of the record when he ruled that trial counsel in closing argument could attack Appellant's credibility by arguing that her in-court testimony was inconsistent with her pretrial

statements to Dr. Brill about the purposes of the 911 call.  As
a result of the military judge's inconsistent rulings, trial
counsel was permitted to use a chart that expressly referred to
the 911 call under the heading "Proven Lies" even though the
defense was precluded from introducing evidence to rebut the
prosecution's suggestion that Appellant's testimony about the
911 call had been fabricated.

## 2.   The test for prejudice

In view of the military judge's erroneous rulings, we must
determine whether there was prejudice with respect to the issue
of self-defense; and, if not, whether there was prejudice with
respect to the issue of premeditation.  See Article 59(a), UCMJ
10 U.S.C. § 859(a) (2000).  Appellant asserts that the military
judge precluded her from presenting a defense -- the impact of
the prior acts on her state of mind -- an error of
constitutional dimension that would be prejudicial unless
harmless beyond a reasonable doubt.  As reflected in the
foregoing discussion of the record, however, Appellant had an
extensive opportunity to present a defense based on the impact
of SGT Dobson's specific acts on her state of mind.  The error
was not that the military judge precluded her from presenting
the state-of-mind defense based on SGT Dobson's acts, but that
he prevented her from introducing corroborating evidence when
her credibility was attacked.  Accordingly, we apply the test

for nonconstitutional evidentiary error, which requires us to weigh four factors: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999).

3.  Impact of the error on self-defense

Applying the Kerr factors, we conclude that there was no prejudice on the issue of self-defense. From the outset of the trial, the prosecution sought to meet its burden on the issue of self-defense by demonstrating that Appellant's actions did not fall within either or both of the elements of self-defense; that is: (1) the objective element, which involves a reasonable apprehension that "death or grievous bodily harm was about to be inflicted"; or (2) the subjective element, which involves a personal belief that the force used "was necessary for protection against death or grievous bodily harm." R.C.M. 916(e)(1).

The Government presented a very strong case as to both elements, consisting of eyewitness and expert testimony. At the point in the affray where the eyewitnesses first viewed it, SGT Dobson was still standing. They saw Appellant aggressively pursue SGT Dobson. Instead of fleeing when she had the opportunity, Appellant taunted and repeatedly attacked SGT

51

Dobson.  The expert witnesses testified that SGT Dobson suffered numerous wounds consistent with defensive behavior, while Appellant did not have any significant wounds.  The Government further strengthened its case by focusing on the numerous fabrications and inconsistencies in Appellant's pretrial statements on critical events.

The defense was unable to offer a significant challenge, either through cross-examination or rebuttal, to either the eyewitness or expert testimony.  Moreover, Appellant provided very little direct evidence.  Appellant provided virtually no details as to events immediately preceding her use of the knife to kill SGT Dobson.  Although her pretrial and trial testimony is filled with detail about her relationship with SGT Dobson, she provided no information as to how they arrived on Sage Street in the middle of the night, who started the fight, who produced the knife, or who first threatened or used deadly force.  Without providing any immediate context, she simply stated that there was a knife between them and SGT Dobson said: "It's me or you now that -- it's me or you now, Bitch.  One of us has to die."  She also stated that he lunged at her with the knife.  She provided no information as to how she obtained the knife or the circumstances in which she used it.

Although her testimony was sufficient to warrant a self-defense instruction, particularly in the context of the

psychological testimony provided by the defense witnesses, the sketchy details did not provide a substantial counterweight to the powerful eyewitness and expert testimony regarding her aggressive behavior, the absence of aggression by SGT Dobson, and her use of the knife when she had ample opportunity to flee. In the context of the evidence presented at trial on the issue of self-defense, the excluded testimony from Ms. Waddell and SFC Johnson was not particularly significant, either with respect to its quality or materiality. The evidence was offered to corroborate Appellant's testimony and establish that she had reason to fear SGT Dobson. The excluded evidence consisted of two incidents of verbal abuse, both of which occurred more than a year prior to the death of SGT Dobson. The import of the testimony would have been diminished by the remoteness in time from the killing of SGT Dobson, the fact that neither witness personally observed the interaction between Appellant and SGT Dobson, and the fact that neither incident involved actual physical abuse. Moreover, the support that it might have given to Appellant's testimony would have been heavily countered by the evidence of her repeated fabrications and deceptions following the death of SGT Dobson.

In short, the prosecution case on self-defense was strong, the defense case was weak, and the quality and materiality of the excluded evidence was of diminished value on the issue of

self-defense.  Under these circumstances, we conclude that the error was not prejudicial as to self-defense.

4.   Premeditation

The Manual provides the following guidance with respect to premeditation:

> A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended.  Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended.  It is not necessary that the intention to kill have been entertained for any particular or considerable length of time.  When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution.  The existence of premeditation may be inferred from the circumstances.

MCM pt. IV, para. 43.c.(2)(a) (2005 ed.).  Unpremeditated murder, however, does not require a similar degree of specificity as to intent.  An unpremeditated murder does not require a fixed intent to kill a specific person after considering the specific act.  A person may be convicted of unpremeditated murder even if the person had no intent to kill prior to taking an act, so long as the act itself was intentional and likely to result in death or great bodily harm. Id. para. 43.c.(3)(a).

In assessing impact of the error of excluding the testimony of Ms. Waddell and SFC Johnson, we note that the prosecution

54

presented legally sufficient evidence on the subject of premeditation, see Jackson v. Virginia, 443 U.S. 307 319 (1979) (test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt).  See supra, Section III. E. 5 (summarizing the evidence).  Although the error did not affect the legal sufficiency of the evidence under the low threshold of Jackson, we must also examine whether the error was prejudicial under the Kerr analysis.  We begin by evaluating the strength of the Government's case on the issue of premeditation.

The prosecution faced a much greater challenge in proving premeditation than it faced in disproving self-defense.  The prosecution presented no direct evidence as to the immediate circumstances that produced a fatal confrontation between Appellant and her husband on Sage Street in the middle of the night.  No one saw the argument begin, how or why it escalated into a physical altercation, who struck the initial blow, who introduced a knife into the affair, or who first used the knife against the other.  Although the prosecution presented substantial evidence from which premeditation could be inferred from her actions on Sage Street and her subsequent attempts at deception, it was evidence from which the panel could have readily concluded that Appellant committed murder without a

preexisting intent -- unpremeditated murder.  Trial counsel's closing statement underscored the difficulties the prosecution faced on the issue of premeditation by candidly acknowledging that the prosecution could not identify the point in time at which Appellant formed a premeditated intent to commit murder.

The defense presented a substantial case on the issue of premeditation.  Through cross-examination, the defense repeatedly underscored the absence of direct prosecution evidence on premeditation.  The defense then presented two expert witnesses who provided a clear, coherent explanation of the impact of spousal abuse on Appellant's intent on the night of the killing, as well as the impact of abuse on her behavior thereafter.  The importance of that testimony has been highlighted, in the present appeal, by the Government in responding to Appellant's claims of ineffective assistance of counsel.  The significance at trial was further highlighted by the Government's persistent efforts to preclude testimony by witnesses who would have corroborated Appellant's testimony about spousal abuse.

In that context, the materiality of the excluded testimony is much more significant on the issue of premeditation than it was on the issue of self-defense.  With no direct evidence of intent, the panel could have accepted all of the Government's evidence pointing to Appellant as the perpetrator of the murder,

but still have a reasonable doubt as to whether she premeditated the murder in light of the impact of abuse on her intent. A key element of the Government's strategy was to convince the panel that they could discount the expert testimony on the impact of abuse on the grounds that they should treat her entire testimony as a lie. Trial counsel emphasized that position during cross-examination by first asking Appellant to tell the panel about the 911 incident, which was immediately followed by detailed cross-examination in an effort to portray her testimony as a fabrication. During closing argument, trial counsel returned to the 911 incident during the course of his argument that there was no corroboration for her testimony. Had the military judge permitted the testimony from Ms. Waddell and SFC Johnson, trial counsel would not have been able to make that argument.

The adverse impact of the military judge's erroneous ruling was heightened by the fact that defense counsel, in his opening statement, specifically told the members that they would hear this testimony of the two witnesses. The defense was then precluded by the military judge's ruling from fulfilling that promise.

In terms of the quality of testimony, there is no indication that the information that would have been provided by Ms. Waddell or SFC Johnson would have been subject to effective impeachment or rebuttal. Under the circumstances of this case,

we cannot be confident that the error of excluding the testimony of these two witnesses was harmless on the issue of premeditation.  See Kotteakos v. United States, 328 U.S. 750 (1946).

5.    Other offenses

In addition to instructing the members on premeditated and unpremeditated murder, the military judge also instructed the members to consider two other offenses.  First, he instructed on voluntary manslaughter -- the unlawful killing of a person when done in the heat of sudden passion caused by adequate provocation.  See MCM pt. IV, para. 44.b.(1).  Second, he instructed on involuntary manslaughter -- a killing that occurs during the commission of an aggravated assault without necessarily having an intent to kill or cause grievous bodily harm.  See MCM pt. IV, para. 44.b.(2).  Although the military judge appropriately recognized that the evidence on these offenses met the low threshold for providing instructions, these lesser offenses were not the focus of the trial.  The record amply reflects the clear understanding of both parties that if the defense was unable to prevail at trial on a theory of self-defense, the critical question at trial would involve the choice between premeditated and unpremeditated murder.

At trial, the defense directed its primary attention on self-defense and premeditation, with only perfunctory references

58

to voluntary or involuntary manslaughter.  On appeal, Appellant has likewise emphasized self-defense and premeditation.  Under these circumstances, we conclude that error in excluding the witnesses was harmless with respect to the offenses lesser than unpremeditated murder.

## V. CONCLUSION

The decision of the United States Army Court of Criminal Appeals is reversed.  The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals.  The court may:  (1) affirm a conviction of the offense of unpremeditated murder and either reassess the sentence or order a sentence rehearing; or (2) authorize a rehearing on the charge of premeditated murder.

United States v. Dobson, No. 05-0004/AR

EVERETT, Senior Judge (concurring):

I concur fully in Judge Effron's excellent opinion in this case. I write separately to make three observations.

First, the opinion rejects some of the claims of ineffective assistance of counsel because of the absence of any prejudice to Appellant, even if defense counsel's performance were defective. Certainly Strickland v. Washington, 466 U.S. 668 (1984), authorizes such treatment of those claims. However, I wish to note that my own review of the extensive record in this complex case convinces me that defense counsel, both civilian and military, performed their duties in a very professional manner -- as also did the prosecutors and military judge.

Second, under the unique circumstances of this case, I join in holding that the testimony from third-party witnesses relating to some incidents of spousal abuse should have been admitted. However, in my view the Court's ruling in this regard should be very narrowly applied in future cases.

Third, I agree fully with the principal opinion's conclusion that, in light of the overwhelming prosecution evidence, the evidentiary error did not affect the court-martial's rejection of Appellant's claim of self-defense. Giving Appellant every benefit of the doubt, I also join in

concluding that Appellant was prejudiced as to the element of premeditation.  Again, the unique circumstances of the case are significant.  Although slaying a victim by stabbing him a hundred times with a knife does not automatically negate premeditation or make the prosecution's evidence of premeditation insufficient, court-martial members might logically reason that this method of homicide indicated a lack of deliberation.  In the unusual factual situation of this case, the erroneous exclusion of evidence of spousal abuse might have affected the court-martial's finding of premeditation.  Therefore, I concur.