# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40391**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Nicholas A. BYRNE**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 22 August 2024

————————————

*Military Judge*: Colin P. Eichenberger.

*Sentence*: Sentence adjudged 5 March 2022 by GCM convened at Luke Air Force Base, Arizona. Sentence entered by military judge on 30 March 2022: Dishonorable discharge, confinement for 5 years, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

*For Appellant*: Major Megan R. Crouch, USAF; Major Eshawn R. Rawlley, USAF; Philip D. Cave, Esquire; Megan P. Marinos, Esquire.

*For Appellee*: Colonel Steven R. Kaufman, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Major Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, DOUGLAS, and MASON, *Appellate Military Judges*.

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Judge DOUGLAS and Judge MASON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of four specifications of assault consummated by a battery upon his spouse, one specification of aggravated assault by strangulation upon his spouse, and one specification of assault consummated by a battery upon BP, all in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928; and one specification of sexual assault against his spouse, in violation of Article 120, UCMJ, 10 U.S.C. § 920.[1,2,3] Appellant was sentenced to a dishonorable discharge, confinement for five years, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings or sentence.[4]

Appellant raises 15 issues on appeal, which we have reworded: (1) whether specifications of assault consummated by battery upon KD, Appellant's spouse, in violation of Article 128, UCMJ, are factually sufficient; (2) whether the specification of aggravated assault by strangulation upon KD in violation of Article 128, UCMJ, is legally sufficient; (3) whether the specification of sexual assault against KD is legally and factually sufficient; (4) whether the specification of assault consummated by a battery upon BP is factually sufficient; (5) whether the military judge abused his discretion in failing to suppress Appellant's statement to investigators; (6) whether the military judge erred in limiting the cross-examination of BP about his pending disciplinary action; (7) whether the military judge abused his discretion by failing to sever the Additional Charge (of assault consummated by a battery upon BP) from the initial charges; (8) whether an accumulation of prosecutorial errors prejudice the findings and sentence; (9) whether the military judge abused his discretion in denying a defense challenge for cause on a panel member; (10) whether the military judge was biased against Appellant; (11) whether the military judge erred during instructions; (12) whether the military judge abused his discretion when he denied a defense motion to dismiss for a violation of Rule for Courts-Martial

---

[1] Unless otherwise noted, all references to the UCMJ, the Military Rules of Evidence (Mil. R. Evid.), and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of five specifications of assault consummated by a battery upon his spouse and of one additional specification of assault consummated by a battery upon BP in violation of Article 128, UCMJ, 10 U.S.C. § 928.

[3] The military judge merged Specification 5 (aggravated assault upon his spouse) and Specification 6 (assault consummated by a battery upon his spouse) of Charge I for sentencing.

[4] The convening authority denied Appellant's request to defer his reduction in rank and to defer automatic forfeitures.

707; (13) whether the military judge erred in limiting the cross-examination of BP regarding the improper use of BP's rank;[5] (14) whether Appellant received effective assistance from his trial defense counsel; and (15) whether an accumulation of errors deprived Appellant of a fair trial.[6] We also considered an additional issue, not raised by Appellant, that was identified during this court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), review: (16) whether Appellant is entitled to relief for delays in post-trial processing in accordance with *United States v. Livak*, 80 M.J. 631 (A.F. Ct. Crim. App. 2020), and *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), or in the alternative, *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002).

We consider Appellant's issues (1), (2), (3), and (4) together since they all concern legal and factual sufficiency of the evidence. We also note issues (6) and (13) are identical in that they address the cross-examination of BP. With respect to issues (6), (7), (9), and (10)–(12) and (15), we have carefully considered Appellant's contentions and find they do not require discussion or warrant relief. *See United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987).

As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

### A. Offenses involving KD[7, 8]

Appellant met KD, a fellow Airman, in March of 2019 while they were both attending technical training. In June 2019, they married and subsequently moved to Vogelweh Air Station, Germany, in August 2019. Shortly after their arrival in Germany, the couple moved to an apartment in Kaiserslautern, Germany.

KD testified that shortly after moving into their apartment, sometime between 1 August 2019 and 25 December 2019, she and Appellant got into an argument regarding furniture purchases. In an attempt to "deescalate the situation" KD went to the couple's bedroom intending to sit down on the bed. In

---

[5] While the language to issues (3) and (16) in Appellant's brief are identical, we reworded this issue to make clear the distinction between the two.

[6] Issues (10)–(15) were personally raised by Appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

[7] Unless otherwise noted, the facts in this section are derived from KD's testimony.

[8] On Appellant's charge sheet, KD is identified as KB, however, at the time of Appellant's trial, they were divorced and KB had assumed her current initials as KD. For purposes of this opinion, we will refer to her as KD.

response, Appellant took the mattress and pillows out of the bedroom and piled them in the hallway. At that point, KD decided that she did not want to stay in the house and walked towards the front door. On her way to the door, she had to walk over the piled-up pillows. Appellant followed her down the hallway where they had another argument. During this argument, Appellant pulled one of the pillows out from under KD's feet, causing her to fall and hit the floor. KD suffered bruises to her knees and breast from the fall.

KD then described that Appellant crawled on top of her and accused her of "f[**]king someone else." She rolled over on her back and the two of them tussled on the floor. At one point, KD's feet were on Appellant's shoulders, and Appellant was "clawing" at her vagina, squeezing the labia and penetrating her vagina with his fingers in the process. During KD's testimony, trial counsel specifically asked her if Appellant's hands or fingers ever penetrated her vagina, and KD answered "Through the shorts, yes. It was scraping my vagina." Trial counsel followed up, asking KD how she knew that Appellant penetrated her vagina, and KD replied, "Because I felt it." KD explained that the whole experience was "[p]ainful," "[s]hocking," and "[w]eird." In an effort to end this altercation KD pushed herself away, but Appellant crawled on top of her. While straddling her torso, he grabbed her by the neck with both of his hands, and then pushed her down. KD described that when Appellant pushed on her neck, "[i]t felt like the insides of [her] neck were being squished into . . . the floor, into [her] neck." After the assault, KD's neck had "blood speckles" where Appellant's fingers had been. KD took digital photographs of her neck injuries and of the bruises that formed on one of her arms, under her breast, on her wrists, her fingers, and her knee. The photographs were admitted during Appellant's court-martial. These actions formed the basis of Appellant's conviction for assault consummated by a battery upon KD by unlawfully grabbing KD by her neck with his hand (Specification 3 of Charge I) in violation of Article 128, UCMJ, and sexual assault (Specification of Charge II) in violation of Article 120, UCMJ.

Around February 2020, KD and Appellant moved into a house next to Ramstein Air Base, Germany, where their marital problems persisted. In May 2020, during an argument in the bedroom, Appellant punched and slapped KD in the leg and buttock and slapped and hit her face. She clarified that Appellant "punched and slapped her multiple times" while chasing her around the room. When KD attempted to leave the bedroom, Appellant strangled her from behind by squeezing her neck between his forearm and bicep. KD explained that Appellant "was squeezing and then raising up. [She] was fighting to get on [her] tippy toes to try and get some air, but the further that [she] leaned back and raised up, the further he leaned back and raised up." KD felt "tingly and heavy" and lost consciousness. Before she lost consciousness, KD believed that she "was going to die" because she "could not breathe at all." The following

day, KD took photographs of her injuries from this assault. These photographs were also admitted during Appellant's court-martial. In particular, the photos showed marked swelling and "blood speckles" on her lip from being slapped across her face, and a visible bruise to her eye that she testified happened "within the fight." Additionally, the photos showed various bruises and welts on her buttock and left leg. These actions formed the basis of Appellant's convictions for aggravated assault by strangulation upon KD with his arm (Specification 5 of Charge I), and assault consummated by a battery upon KD by striking her on her face, buttock, and leg (Specification 6 of Charge I), both in violation of Article 128, UCMJ.

In September 2020, Appellant and KD had two volatile arguments. The first argument progressed to the point where KB felt she had to run into the bedroom to try and get away from Appellant. Appellant followed her there and the argument escalated. At some point, KD grabbed the attic stick[9] from the corner of the room and pointed it at Appellant in an attempt to keep him away from her. Appellant took the stick from KD, pulled her off the bed, and jabbed her in the shoulder with it. As a result, KD suffered a bruise to her shoulder. KD again took photographs of her injury, which were admitted at trial. During another incident, the couple was arguing about Appellant's upcoming deployment, and Appellant slapped KD with his hand across the face, hitting her on the lips. When she attempted to leave the room, Appellant threw an aerosol can and an iron at her, hitting her in on the back and on her leg. KD again took photos of her injuries which were also admitted at trial. These two incidents formed the basis of Appellant's convictions for assault consummated by a battery upon KD by striking her body with a wooden rod and by striking her body with an aerosol can (Specifications 7 and 10 of Charge I), both in violation of Article 128, UCMJ.

On 15 December 2020, KD reported the assaults to the Air Force Office of Special Investigations (OSI) and provided agents with 21 photographs that detailed injuries from the various assaults.

**B. Offense involving BP[10],[11]**

On the evening of 13 November 2021 into the morning of 14 November 2021, BP was in Landstuhl, Germany, celebrating a friend's birthday. During the evening, BP stated he had approximately four alcoholic drinks at two

---

[9] KD explained that an attic stick is "a thicker stick, kind of like a broomstick, that ha[d] a hook on the end."

[10] Unless otherwise noted, the facts in this section are derived from BP's testimony.

[11] At the time of the alleged offenses, BP was a senior noncommissioned officer in the United States Army.

different off-base bars. After the celebration, BP then went to a strip club, in part to see a friend who worked there. While he was there, BP consumed some champagne and conversed with his friend and another patron. Appellant approached their group and repeatedly injected himself into the conversation in a sarcastic and "mocking" manner. Later, BP explained that as he was walking to see his friend, he noticed Appellant staring at him with a "snarl look." BP explained that as he got closer to Appellant, he asked Appellant, "What the f[**]k, dude? Why are you staring at me this whole time?" Appellant responded, "Well, let's go in the bathroom and talk about it." BP agreed to go with Appellant because he intended to address Appellant as a senior noncommissioned officer and tell Appellant that he needed to "knock off" whatever he was "instigating."

After they went into the bathroom, BP turned around and saw that Appellant was inches from his face. In response, BP put his hands up with his palms facing out and took a step back, at which point Appellant punched him in his left eye with his right fist. While BP attempted to protect his head, Appellant struck him with his hand again, this time in the back of his head. BP turned away from Appellant, and Appellant grabbed BP by the back of his head and slammed it into a mirror, which gave BP a cut on his right eyebrow. BP became dizzy, stumbled and went to the ground. While BP was laying on the bathroom floor on his right side, Appellant then kicked him on the left buttocks and tried to stomp on him. The altercation ended when Appellant's friend, CH, came into the bathroom and restrained Appellant.

In its case in chief, the Defense called several witnesses including CH, an Air Force enlisted active-duty member and Appellant's coworker. During his testimony, CH stated that he was out with Appellant and other friends "club hopping." As CH was getting ready to leave, he heard shouting and a mirror crack in the bathroom and saw Appellant and another individual "going at it," meaning that both Appellant and BP were "basically fighting, like, both of them [were] on the ground" and "both [had] their hands on each other." CH testified that he did not see who started the fight because the fight was already in progress when he got to the bathroom. CH and another Airman pulled Appellant and BP apart and then CH checked Appellant over and went back into the bathroom to get him some paper towels because Appellant was bleeding.

A few hours later, at approximately 0730 that same day, security forces personnel contacted Appellant by telephone. During the phone conversation they obtained Appellant's location and sent a patrol car to apprehend Appellant for the assault and transported him to the police station to conduct an interview. A short while later, Appellant spontaneously stated, in the presence of JM, an active duty security forces servicemember, "something along the lines

of 'I've hit my wife before.'" Appellant was later taken to a local medical facility for injuries to his hand, and then was released to his first sergeant.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant raises several issues concerning the legal and factual sufficiency of the charges of which he was convicted. Specifically, Appellant alleges the following are factually insufficient: four specifications of assault consummated by a battery and one specification of aggravated assault by strangulation upon KD in violation of Article 128, UCMJ; one specification of sexual assault against KD in violation of Article 120, UCMJ; and the additional specification of assault consummated by a battery upon BP in violation of Article 128, UCMJ. Appellant asks this court to set aside the findings and sentence. We disagree with Appellant's contentions and find no relief is warranted.

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. 394, 399 (C.A.A.F 2002)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

To convict Appellant of assault consummated by a battery upon KD, the Government was required to prove the following elements beyond a reasonable doubt: (1) that Appellant did bodily harm to KD; (2) that the bodily harm was done unlawfully; (3) that the bodily harm was done with force or violence; and (4) that KD was Appellant's spouse.[12] *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 77.b.(3)(c).

To convict Appellant of aggravated assault by strangulation upon KD, the Government was required to prove the following elements beyond a reasonable doubt: (1) Appellant did bodily harm to KD; (2) Appellant did so by strangulation; (3) that the strangulation was done with force and violence; and (4) that KD was Appellant's spouse. *See* Article 128, 10 U.S.C. § 928.[13]

To convict Appellant of sexual assault in violation of Article 120, UCMJ, the Government was required to prove beyond a reasonable doubt the following elements: (1) that Appellant committed a sexual act upon KD by penetrating her vulva with his fingers with the intent to abuse, humiliate, harass, or degrade her; and (2) that he did so without her consent. *MCM*, pt. IV, ¶ 60.a.(g)(1)(C), 60.a.(b)(2)(A).

To convict Appellant of assault consummated by a battery upon BP the Government was required to prove the following elements beyond a reasonable doubt: (1) that Appellant did bodily harm to BP; (2) that the bodily harm was done unlawfully; (3) that the bodily harm was done with force or violence. *MCM*, pt. IV, ¶ 77.b.(2).

Rule for Courts-Martial (R.C.M.) 916(e)(3) sets out the elements for the defense of self-defense for assault offenses under the umbrella of Article 128, UCMJ, including assault consummated by a battery (to include upon a spouse), and aggravated assault by strangulation upon a spouse. For a successful claim of self-defense under this Rule, the members must find that an appellant: (1) "[a]pprehended, on reasonable grounds, that bodily harm was about to be inflicted wrongfully on [appellant];" and (2) "[b]elieved that the force [Appellant]

---

[12] Specification 6 (striking KD on her face, buttock, and leg) also included language "on divers occasions."

[13] At the time of its publication, the 2019 *Manual for Courts-Martial* listed strangulation under Article 128(b), UCMJ, AGGRAVATED ASSAULT. *See MCM*, App. 2, at A2-45. However, the elements for strangulation were not listed in the *Elements* section of Article 128, UCMJ. *See MCM*, ¶ 77.b.(4)(b) (reflecting the absence of strangulation). At the time of Appellant's trial, all parties agreed to the elements for strangulation proposed by the military judge. The same elements were subsequently included in the *Elements* section of Article 128, UCMJ, in the *Manual for Courts-Martial, United States* (2023 ed.), and the *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*). *See* 2024 *MCM*, pt. IV, ¶ 77.b.4(d)(i)–(iii).

used was necessary for protection against bodily harm, provided that the force used by [appellant] was less than the force reasonably likely to produce death or grievous bodily harm." R.C.M. 916(e)(3). "The first element . . . has an objective component, involving the perception of a reasonable person under the circumstances," that is, an accused must actually apprehend the threat and believe the force used is necessary to counter the threat. *United States v. Dobson,* 63 M.J. 1, 11 (C.A.A.F. 2006). However, "[t]he second element . . . is wholly subjective, involving the personal belief of the accused, even if not objectively reasonable." *Id.* For the objective component of self-defense, the test "is whether, considering all the circumstances, a reasonable, prudent person would believe there was ground to fear death or grievous bodily harm." *United States v. Jackson*, 36 C.M.R. 101, 106 (C.M.A. 1966).

The right to self-defense is not available to an accused who "was an aggressor, engaged in mutual combat, or provoked the attack which gave rise to the apprehension, unless the accused had withdrawn in good faith after the aggression, combat, or provocation and before the offense alleged occurred." *United States v. Dearing,* 63 M.J. 478, 484 (C.A.A.F. 2006) (citing R.C.M. 916(e)(4)). However, an accused who starts an affray is entitled to use reasonable force in self-defense to defend against an opponent who escalates the level of the conflict. *Id.* at 484 n.24 (citing *United States v. Cardwell*, 15 M.J. 124, 126 (C.M.A. 1983)).

### 2. Analysis

#### *a. Factual Sufficiency of Assault Consummated by a Battery and Aggravated Assault Upon KD*

Appellant challenges the factual sufficiency of his convictions for assault consummated by a battery upon his spouse, KD, and for aggravated assault by strangulation upon KD, in violation of Article 128, UCMJ. Specifically, Appellant contends now, as he did at trial, that there were substantial reasons to question the credibility of KD's testimony. We are not persuaded by Appellant's arguments.

After a thorough review of the record of trial, Appellant's trial defense counsel, during his cross-examination of KD, highlighted numerous reasons to question the veracity of her testimony, including her potential motives to outright fabricate her allegations. He also highlighted issues with the photographs KD took of her injuries. Appellant's trial defense counsel sufficiently exposed each of these issues during Appellant's court-martial. The evidence and arguments made by Appellant's trial defense counsel are part of the record of trial which we have reviewed. We find that the Government in this case provided convincing evidence through KD's testimony that Appellant grabbed her by her neck while he and KD resided in their first apartment in Germany

in the latter half of 2019; struck her face, buttock, and leg with his hand on divers occasions in May 2020; struck her with a wooden rod in May 2020; strangled her with his arm in May 2020; and struck her with an iron and aerosol can in September 2020. There are ample reasons to believe that Appellant committed the offenses of which he was convicted. We specifically find that KD's testimony was supported by digital photographs, depicting the injuries KD suffered at the hands of Appellant, and JM's testimony that in her presence Appellant stated, "I've hit my wife before," or words to that effect, a statement we find incriminating and unprovoked. Having weighed the evidence in the record of trial—including the reasons to question KD's credibility—and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

### b. Legal Sufficiency of Striking KD on her Face and Buttock on Divers Occasions

Appellant contends that there was insufficient evidence to prove that he struck KD on her "face" and "buttock" on divers occasions. Appellant argues that the evidence only demonstrates that he struck her once on her face and buttock. We disagree.

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was sufficient for a rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. Here, KD's testimony and the digital photographs detailed multiple injuries to her face, buttock, and leg. Specifically concerning her face, the photographs show two different injuries, one to her lip and another to her eye that she testified occurred during the assault. While KD did not have a specific memory as to how she was hit in the eye, her testimony was clear that the injury to her eye happened "within the fight." Additionally, with regards to KD being struck on the buttock, she testified that Appellant "punched and slapped her multiple times," and the photographs detailed what appear to be multiple bruises on both her buttock and leg, as well as hand-shaped welts on both her buttock and leg. These photographs suggest multiple injuries to her buttock and leg that are consistent with being struck—"punched and slapped" by Appellant's hand—multiple times. In conclusion, we find Appellant's conviction for this specification is legally sufficient.

### c. Legal and Factual Sufficiency of Sexual Assault Against KD

Appellant next contends that his conviction for sexually assaulting KD is both legally and factually insufficient. Specifically, Appellant argues that there was insufficient evidence to support that Appellant penetrated KD's vagina with his fingers. In presenting this argument, Appellant suggests that he may

have used some other part of his hand other than his fingers to "claw" at and into KD's vagina. Additionally, Appellant suggests it is possible that KD's shorts alone penetrated her vagina. We are not persuaded by Appellant's arguments.

Here, we find that the Government presented convincing evidence, through KD's testimony, for a rational trier of fact to have found the essential elements of sexual assault beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. KD's testimony in no uncertain terms established that during a fight at her apartment Appellant "clawed" at her vagina over her shorts and that his fingers penetrated her vagina without her consent. Viewing this evidence in the light most favorable to the Prosecution and drawing every reasonable inference from the evidence of record in favor of the Prosecution, we find that Appellant's conviction for sexual assault is legally sufficient. The fact that her shorts may have also penetrated her vagina does not exonerate Appellant of criminal liability. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

### d. Factual Sufficiency of Assault Consummated by Battery Upon BP

Appellant challenges the factual sufficiency of his conviction for assault consummated by a battery upon BP in violation of Article 128, UCMJ. In particular, Appellant contends that the Government failed to prove beyond a reasonable doubt Appellant's self-defense claim. We disagree.

Here, the evidence showed that Appellant was the aggressor and struck BP without physical provocation. We note that BP's testimony detailed how Appellant repeatedly interjected himself in BP's conversation with two other individuals and "mock[ed]" BP. Then, after BP diffused the situation, and Appellant walked away, Appellant continued to angrily "stare" at BP from the other end of the club. When BP verbally confronted Appellant for staring at him, Appellant told BP that they should go into the bathroom and discuss it. In the bathroom, Appellant immediately came up within inches of BP who put his hands up with his palms facing out in a defensive posture and took a step back. Ignoring BP's non-verbal signals that he was not looking for a physical altercation, Appellant punched him in his eye. When BP attempted to protect himself, Appellant struck him on the head a second time and then grabbed BP by the back of his head and slammed his head into a bathroom mirror. After BP went to the ground, Appellant kicked him in the buttocks. The attack continued until Appellant was physically restrained by another Airman.

During Appellant's court-martial, the military judge provided a thorough instruction on self-defense, including the Government's burden of disproving it beyond a reasonable doubt. We note that BP testified under oath concerning the assault, and the Government introduced photographs of the injuries sustained by BP because of the assault. These photographs depicted significant bruising and cuts to both of his eyes. We also note that there was no evidence that BP struck or attempted to strike Appellant at all. We find that BP's accounts of the events were logical, and the court members were reasonable in crediting his testimony and finding that Appellant did not act in self-defense.

Having weighed the evidence in the record of trial—including the reasons to question BP's testimony—and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. We are also convinced that the Government proved beyond a reasonable doubt that the defense of self-defense was not reasonable under the circumstances because Appellant was the aggressor who escalated his anger to a physical altercation. We therefore conclude that Appellant's conviction for assault consummated by a battery upon BP was factually sufficient.

## B. Defense Motion to Suppress

Appellant argues that the military judge abused his discretion in failing to suppress his statements to investigators. Specifically, Appellant contends that he was "interrogated" by military security forces without a proper rights advisement. Appellant further argues that he was prejudiced by these statements, and that we should set aside the findings and sentence. We disagree and find no relief is warranted.

### 1. Additional Background

On 25 February 2022, the Defense moved the trial court to suppress statements made by Appellant to security forces on 14 November 2021 regarding the early morning incident involving BP. Specifically, the Defense sought to exclude three statements made by Appellant: (1) "[T]hat guy isn't s[**]t, he got his a[*]s beat and he had to go tell;" (2) "I hope my hand bleeds out so much that I pass out and don't wake up;" and (3) "I've hit my wife before." The Government opposed the motion. On 28 February 2022, the military judge held an Article 39(a), 10 U.S.C. § 839(a), hearing. At the hearing the Government presented testimony from JM, an active duty security forces member who witnessed Appellant's statements summarized above. The military judge's findings of fact, which are not in dispute, are described below.

At around 0600, on 14 November 2021, security forces responded to a call of an alleged assault at an off-base local club. Upon arriving at the scene,

security forces contacted BP, who claimed Appellant physically assaulted him in the bathroom of the club by striking him in the head with a closed fist.

At approximately 0730, security forces contacted Appellant by telephone. During the phone conversation, they obtained Appellant's location and sent a patrol car to apprehend Appellant for assault, in which JM and her partner transported Appellant to their police station. While exiting the vehicle at the station, Appellant stated that he was already "in so much s[**]t, he is better off dead." Appellant was then taken to an interview room where JM asked Appellant if he would consent to a breath alcohol test and if he would be willing to make a written statement. Appellant declined, stating that he would not sign anything without a lawyer. JM then exited the interview room while another security forces officer remained with Appellant.

At least one security forces member remained with Appellant the entire time he was in security forces custody for safety purposes. JM explained that they needed to keep eyes on Appellant to ensure he did not hurt himself, have a medical issue caused by his intoxication, or try to leave the police station. During Appellant's time in police custody, the internal camera system at the police station was not functioning. After JM came back to the interview room to relieve the other officer, Appellant initiated a conversation stating, "[T]hat guy isn't s[**]t, he got his a[*]s beat and he had to go tell." At trial, JM testified that she did not initiate a conversation with Appellant. However, after Appellant began speaking to her, JM asked Appellant how his hand injury was doing. Appellant responded by showing JM his hand, which prompted JM to ask Appellant if he needed medical attention. According to JM, Appellant responded by saying, "I hope it bleeds out so much that I pass out and don't wake up."

A short while later, Appellant stated he had "hit [his] wife before," or words to that effect, and that he had been in an interview room before for a past suicidal ideation. Later, Appellant was taken to a local medical facility, and then was released to his first sergeant. Appellant was not read his Article 31(b), 10 U.S.C. § 831(b), rights at any point during his interaction with the security forces personnel.

In his written ruling, the military judge concluded that "[n]otwithstanding law enforcement's failure to properly rights advise the [Appellant,] and the [Appellant]'s potential invocation of his right to counsel, none of the [Appellant]'s statements that the Defense seeks to suppress were made in response to law enforcement interrogation." The military judge ultimately concluded that the statements were admissible and denied the defense motion to suppress Appellant's statements. In reaching this conclusion, the military judge found that "[Appellant] spontaneously and voluntarily made the statements the Defense seeks to suppress."

He also found that JM did not do anything to initiate the exchange with Appellant, and that she was merely present in the room to ensure Appellant's safety. While discussing JM's question about medical treatment for Appellant's hand, the military judge explained that "even when viewed from the perspective of the [Appellant], an incriminating response was neither sought nor a reasonable consequence of [JM]'s question." The military judge further explained that a "reasonable consequence of the question was simply a yes or no answer . . . ."

**2. Law**

We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)). The military judge's findings of fact are reviewed for clear error, but his conclusions of law are reviewed de novo. *United States v. Keefauver*, 74 M.J. 230, 233 (C.A.A.F. 2015) (citation omitted).

"[T]he abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than just a difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted).

"A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004). "In reviewing a ruling on a motion to suppress, we consider the evidence in the light most favorable to the prevailing party." *United States v. Cowgill*, 68 M.J. 388, 390 (C.A.A.F. 2010) (citation omitted).

Servicemembers are generally entitled to the protections of the Fifth Amendment.[14] *United States v. Tempia*, 37 C.M.R. 249, 253–55 (C.M.A. 1967). The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. Once a suspect in custody has "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981); *see* Mil. R. Evid. 305(e)(3).

---

[14] U.S. CONST. amend. V.

"The protections afforded to servicemembers under Article 31(b), UCMJ, are in many respects broader than the rights afforded . . . under the Fifth Amendment to the Constitution." *United States v. Evans*, 75 M.J. 302, 303 (C.A.A.F. 2016) (citations omitted). Article 31(b), UCMJ, provides:

> No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

"Voluntariness of a confession is a question of law that an appellate court independently reviews, de novo." *United States v. Bubonics*, 45 M.J. 93, 94 (C.A.A.F. 1996) (italics and citations omitted). A statement is "involuntary" if it is "obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, Article 31,[ UCMJ, 10 U.S.C. § 831,] or through the use of coercion, unlawful influence, or unlawful inducement." Mil. R. Evid. 304(a)(1)(A); *see also* Article 31(d), UCMJ, 10 U.S.C. § 831(d) ("No statement obtained from any person in violation of [Article 31, UCMJ], or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."). With limited exceptions, an involuntary statement of an accused and any evidence derived therefrom is inadmissible at trial, provided the Defense makes a timely motion or objection. Mil. R. Evid. 304(a). The burden is on the Government to prove by a preponderance of the evidence, under the totality of the circumstances, that the confession was voluntary. *Bubonics*, 45 M.J. at 95 (citations omitted).

Mil. R. Evid. 305(b)(2) defines interrogation as "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning."

"[I]nterrogation involves more than merely putting questions to an individual." *United States v. Ruiz,* 54 M.J. 138, 141 (C.A.A.F. 2000); *cf. Brewer v. Williams*, 430 U.S. 387, 399 (1980) (concluding that deliberately and designedly setting out to elicit information constituted interrogation).

There is no blanket prohibition against a comment or a statement by a police officer to a suspect after the suspect has invoked his rights to remain silent or consult with counsel. *United States v. Young,* 49 M.J. 265, 267 (C.A.A.F. 1998).

Finally, spontaneous statements by an accused, not uttered in response to an interrogation or its functional equivalent, are admissible even absent a

formal rights advisement. *See United States v. Lichtenhan*, 40 M.J. 466, 469 (C.M.A. 1994) ("Spontaneous statements, even though incriminating, are not within the purview of Article 31.").

**3. Analysis**

On appeal, Appellant maintains his argument at trial that the three statements described *supra* were the product of improper law enforcement interrogation. We disagree.

After reviewing the ruling in the light most favorable to the prevailing party, we conclude the military judge did not abuse his discretion by denying the defense motion to suppress Appellant's statements. The military judge's conclusion that Appellant's statements were made spontaneously in the presence of security forces personnel and were not the product of law enforcement interrogation is well supported by the record. Here, the Government provided direct testimony from JM who explained that she was only in the interview room to ensure Appellant did not hurt himself, have a medical issue caused by his intoxication, or try to leave the police station. She further provided that the only question she asked Appellant after he invoked his right to counsel was if he required medical treatment for his hand. Based on our review of the entire exchange, we agree with the military judge that a reasonable consequence of the question was "a yes or no answer," and that it was not a formal question designed to elicit an incriminating response. We find that the military judge's ruling was accurately informed and supported by the record and that his conclusion of law was not "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Solomon*, 72 M.J. at 179. Therefore, Appellant is not entitled to any relief on this issue.

**C. Prosecutorial Misconduct**

As part of issues (8) and (13), Appellant contends that trial counsel committed an accumulation of errors resulting in prosecutorial misconduct during his trial. We address three of Appellant's claims: (1) whether trial counsel improperly asked the members to convict the Appellant on a predisposition to be violent in her opening statement; (2) whether the trial counsel disparaged defense counsel in his closing argument; and (3) whether trial counsel attempted to inflame the passions of the members by referring to BP's rank during trial and sentencing argument. We find Appellant is not entitled to relief.

**1. Additional Background**

**a. Opening Statement**

Appellant takes issue with the italicized portions of assistant trial counsel's opening statement.

"I've hit my wife before." Those are [Appellant]'s words after assaulting his latest victim, talking about his now ex-wife, [KD]. Your Honor, president, members, in this trial *you're going to learn a lot about the [Appellant]*. You're going to hear a lot about *his aggression and his repeated abuse.*

He first took out his aggression on the person that was closest to him, his now ex-wife [KD], and when [KD] finally got away and was safe from [Appellant], his aggression was directed towards another. You're going to hear in this trial about another victim, [BP], a victim of assault.

### b. Closing and Rebuttal Arguments

Appellant also takes issue with the following italicized portions of trial counsel's closing argument. Circuit trial counsel began his closing argument as follows:

*"I've hit my wife before."* Those are the words of [Appellant]. *"I'm going to hurt [KD] more than I ever have before."* Those are also the words of [Appellant].

Panel members, those words confirm the testimony that you heard from [KD], formally [military rank] [KD]. She got up on the stand and she told you how she suffered abuse at the hands of [Appellant]. She told you that she couldn't remember all the details of every incident because there were so many. She also told you that she's for the truth.

Later, circuit trial counsel argued:

Panel members, you also heard testimony, you saw evidence that just a few months ago, [Appellant] *aggressively attacked [BP].* Just a few months ago, back in November 2021. You heard [BP] talk about how he was out that night, swapping war stories with a buddy. And that the [Appellant] came and interjected. He was instigating, looking for a fight, looking to – to rile him up.

During his rebuttal argument on the findings, circuit trial counsel argued:

Panel members, the judge advised you to use your common sense and knowledge of the ways of the world when weighing witness credibility. Is it so surprising that domestic violence like this happens? Or should you be looking for *this wild conspiracy* theory? Is that a real possibility, such that the accused isn't guilty? It's not.

During Appellant's court-martial, trial counsel addressed BP by his military rank and name, and referred to him by his military rank and name during argument. Trial defense counsel did not object to any of the above statements.

**2. Law**

We review claims of prosecutorial misconduct and improper argument de novo; when no objection is made at the court-martial, the error is forfeited, and we review for plain error. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). Under the plain error standard, such "error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). "The burden of proof under a plain error review is on the appellant." *Voorhees,* 79 M.J. at 9 (citation omitted).

"Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *Id.* at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88) (additional citation omitted).

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel is entitled to respond to matters raised by an accused or his counsel. *United States v. Gilley*, 56 M.J. 113, 121–23 (C.A.A.F. 2001). Trial counsel "may strike hard blows," but not "foul ones," and may not "inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted). In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *Gilley*, 56 M.J. at 121. We do not "surgically carve out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238 (internal quotation marks omitted).

It is improper for trial counsel "to attempt to win favor with the members by maligning defense counsel." *Fletcher*, 62 M.J. at 181 (citations omitted). Our superior court, the United States Court of Appeals for the Armed Forces (CAAF), has stated that "derogatory comments about opposing counsel can

detract from the dignity of judicial proceedings." *Id.* (internal quotation marks and citation omitted).

"In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *Voorhees,* 79 M.J. at 12 (quoting *Fletcher*, 62 M.J. at 184). In assessing prejudice from improper argument, we analyze: "(1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction." *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013) (citation omitted); *Fletcher*, 62 M.J. at 184. It is Appellant's "burden to prove that there is a reasonable probability that, but for the error the outcome of the proceeding would have been different." *Voorhees*, 79 M.J. at 12 (internal quotation marks and citation omitted). In some cases, "the third factor may so clearly favor the [G]overnment that the appellant cannot demonstrate prejudice." *Sewell*, 76 M.J. at 18 (citing *Halpin*, 71 M.J. at 480).

The CAAF has identified five indicators of severity of prosecutorial misconduct: "(1) the raw numbers—the instances of misconduct as compared to the overall length of the argument; (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations; and (5) whether the trial counsel abided by any rulings from the military judge." *Fletcher*, 62 M.J. at 184 (citation omitted). In *Halpin*, the CAAF extended the *Fletcher* test to improper sentencing argument. 71 M.J. at 480. In assessing prejudice, the lack of a defense objection is "'some measure of the minimal impact' of a prosecutor's improper comment." *Gilley*, 56 M.J. at 123 (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

### 3. Analysis

Appellant first contends that assistant trial counsel's use of Appellant's prior statements during her opening statement was improper because "those words are the functional equivalent of asking the members to convict the Appellant on a predisposition to be violent." Appellant also contends that circuit trial counsel's closing argument and rebuttal argument—which also highlighted Appellant's words—was similarly improper. Since trial defense counsel did not object, we review for plain error.

We disagree with Appellant's contention that the opening statement was improper. Here, assistant trial counsel's opening statement presented a roadmap for the members as to the evidence the Government expected to present during trial. Appellant's statements highlighted *supra* were presented during trial through witness testimony. Likewise, trial counsel's use of Appellant's own words during closing argument was proper as trial counsel is

allowed to argue evidence in the record. Therefore, we find no plain or obvious error with assistant trial counsel's opening statement or closing argument.

Next Appellant argues that circuit trial counsel disparaged trial defense counsel during his rebuttal argument by calling trial defense counsel's argument a "wild conspiracy theory." Again, trial defense counsel did not object to this argument, thus, we review for plain error. We see no evidence in the record to support Appellant's contention that circuit trial counsel disparaged trial defense counsel. While circuit trial counsel did use the phrase "wild conspiracy theory," it was not used in a disparaging way towards Appellant's counsel and was only responding to trial defense counsel's theory on the evidence. As the CAAF has recognized, trial counsel are entitled to respond to matters raised by an accused or his counsel. *Gilley*, 56 M.J. at 121–23. Therefore, we find no error, plain or obvious, with circuit trial counsel's rebuttal argument.

Finally, Appellant personally argues that trial counsel's use of BP's rank during trial was not relevant and was an attempt by trial counsel to improperly inflame the passions of the members. We find no merit to this argument. Trial defense counsel not only did not object at any point to the use of BP's rank during trial, but trial defense counsel himself referred to BP by his military rank during trial and during his own closing argument. We find no evidence that trial counsel attempted to use BP's military rank to improperly inflame the passions of the panel. To the contrary, BP's own testimony confirmed that he did not believe that Appellant knew that he was in the military or senior in rank to Appellant. Again, reviewing this assignment of error under the plain error standard, we find that trial counsel was properly arguing facts in evidence, we find no error, concerning trial counsel's use of BP's military rank.

## D. Ineffective Assistance of Counsel

Appellant personally alleges that his trial counsel were deficient because they (1) "conceded the general accuracy of at least one of the statements" to JM and "effectively conceded" Appellant's guilt; (2) failed to secure a fair and impartial panel for Appellant's court-martial; (3) failed to adequately explore the effect of a panel member's family history of alcoholism; (4) failed "to articulate a public perception challenge as a component" of challenges for implied bias; (5) failed to challenge four named panel members; (6) failed to have Appellant testify "on the motion to suppress;" (7) failed to object to certain arguments by trial counsel with regard to Appellant's character for violence or propensity to commit acts of violence, or to "seek a limiting instruction;" (8) failed to object to certain quoted testimony; (9) failed to adequately impeach or cross-examine KD; (10) failed to obtain discovery of KD's Facebook messages relating to Appellant; (11) failed to object to argument by trial counsel relating to BP's rank and "gloss[ed] over the fact" that Appellant was unaware of BP's rank; (12) failed "to use a bathroom diagram" that Appellant provided to challenge

evidence and testimony related to the bathroom; (13) failed to request a "tailored procedural instruction on self-defense;" (14) failed to confront or "adequately challenge" BP on "inconsistent and self-serving testimony;" (15) "failed to call CK[15] for various purposes," including impeaching BP; (16) failed to provide a sufficient evidentiary basis for compelling the production of a consultant in toxicology; (17) failed to request a limiting instruction with regard to BP's rank at the sentencing phase of Appellant's court-martial; and (18) failed to object to testimony relating to Appellant's failure to apologize.

On 7 May 2024, we ordered Appellant's trial defense counsel, Mr. EG, Major (Maj) NA, and Maj DB, to provide responsive declarations to address Appellant's ineffective assistance of counsel claims.[16] We find that Appellant has failed to meet his burden to demonstrate deficient performance, and therefore Appellant is not entitled to relief.

### 1. Additional Background

Appellant submitted a declaration to this court to accompany his assignments of error brief. In his declaration, Appellant discusses a few examples in support of his claim of ineffective assistance of counsel. However, we note that Appellant's declaration did not address most of the alleged deficiencies he personally raised in his *Grostefon* brief. *See United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

Conversely, all three of Appellant's trial defense counsel submitted declarations to this court pursuant to our 7 May 2024 order. In their declarations, trial defense counsel provided detailed answers concerning each of the 18 alleged deficiencies raised by Appellant. In general, all three declarations detailed the thorough pretrial investigation, the case strategies they considered, and the strategic and tactical decisions they made during Appellant's court-martial.

### 2. Law

The Sixth Amendment[17] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In

---

[15] CK is a German civilian member of law enforcement tasked with working alongside United States Air Force security forces. He was part of the security forces response at the club where the incident between Appellant and BP took place.

[16] Because the issue was raised in the record but was not fully resolvable by those materials, we may consider the declarations submitted by trial defense counsel consistent with *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020).

[17] U.S. CONST. amend. VI.

assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are the appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id.* (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on an appellant to demonstrate both that counsel's performance was deficient, and the deficiency resulted in prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). An appellant overcomes the presumption of competence only when he shows there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Datavs*, 71 M.J. at 424 (citations omitted). In reviewing the decisions and actions of trial defense counsel, this court ordinarily does not second-guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474–75 (C.A.A.F. 2005).

"When a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion . . . , an appellant must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. Beauge*, 82 M.J. 157, 167 (C.A.A.F. 2022) (omission in original) (citation omitted).

This court does "not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine[s] 'whether counsel made an objectively reasonable choice in strategy' from the available alternatives." *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (quoting *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)). For this reason, defense counsel receive wide latitude in making tactical decisions. *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (citing *Strickland*, 466 U.S. at 689). This also applies to trial defense counsel's strategic decisions. *Morgan*, 37 M.J. at 410 (citations omitted). "[S]trategic choices made by trial defense counsel are virtually unchallengeable after thorough investigation of the law and the facts relevant to the plausible options." *Akbar*, 74 M.J. at 371 (internal quotation marks and citation omitted).

In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 688. Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

In determining whether to grant a post-trial hearing to resolve a factual matter pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967) (per curiam), we are guided by the standard pronounced in *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997). Courts of Criminal Appeals do not "decide disputed questions of fact pertaining to a post-trial claim, solely or in part on the basis of conflicting affidavits submitted by the parties." *Ginn*, 47 M.J. at 243. Instead, we employ the principles for determining whether a *DuBay* hearing is appropriate. *United States v. Sales*, 56 M.J. 255, 258 (C.A.A.F. 2002) (citing *Ginn*, 47 M.J. at 248); *see also* Article 66(f)(3), 10 U.S.C. § 866(f)(3).

### 3. Analysis

As a preliminary matter, we have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's assertions and that of his trial defense team. *See Ginn*, 47 M.J. at 248. We find a hearing unnecessary to resolve Appellant's claims. Having made the determination that we can resolve the legal issue without further fact-finding, we begin with the presumption that Appellant's counsel were competent. *Cronic*, 466 U.S. at 658.

After review of the declarations, we find that Appellant has failed to meet his burden to demonstrate deficient performance by his trial defense counsel. We find Appellant's trial defense counsel conducted a thorough investigation of each of the charges and specifications, to include interviewing the relevant

witnesses, visiting the places where the offenses occurred, and reviewing the evidence presented by the Government. We find that trial defense counsel's investigation assisted with developing several areas they used during trial to effectively challenge the testimony provided by witnesses, including KD, BP, and JM. Their preparation permitted the Defense to file a number of pretrial motions and deliver argument on complex issues of law.

Furthermore, all three trial defense counsel have articulated and explained numerous strategic and tactical decisions they made both leading up to trial as well as during the trial itself. We find their thought processes were reasonable and we do not second guess strategic decisions. *See Morgan*, 37 M.J. at 410. We recognize that different trial defense counsel may have chosen a different strategy, but we do not find Appellant's trial defense counsel's strategy to be "outside the wide range of professional assistance that constitutes effective assistance of counsel." *Lilly v. Gilmore,* 988 F.2d 783, 787 (7th Cir. 1993). On this point, we note that their strategy led to Appellant being acquitted of five specifications of assault consummated by battery upon KD and one specification of assault consummated by battery upon BP, all in violation of Article 128, UCMJ.

Finally, we note that a few of Appellant's raised deficiencies hinge on this court finding error elsewhere in Appellant's record. Since we do not find any error that materially prejudiced a substantial right of Appellant, we find no merit to Appellant's alleged deficiencies.

In conclusion, after applying the *Polk* framework to address claims of ineffective assistance of counsel, we conclude that Appellant has not overcome the presumption of competence and has failed to demonstrate either deficient performance or that his trial defense counsel's performance was "measurably below the performance . . . [ordinarily expected] of fallible lawyers." *See Polk*, 32 M.J. at 153 (omission and alteration in original) (citation omitted). We therefore conclude that no relief is warranted.

### E. Post-Trial Delay

The military judge sentenced Appellant on 5 March 2022. Appellant's record of trial was docketed with this court on 20 December 2022. Over the Government's objection, this court granted Appellant's request for 14 enlargements of time to file his assignments of error brief. Appellant's brief was filed on 23 April 2024, 490 days after the case was docketed with the court. On 21 June 2024, the Government filed their answer to Appellant's brief. On 26 June 2024, we granted Appellant an enlargement of time for 30 days to file his reply brief to the Government's answer. Appellant's reply brief was filed on 26 July 2024. This court is issuing its opinion 20 months after docketing.

We review the question of whether an appellant's due process rights under the Fifth Amendment are violated because of post-trial delay de novo. *Livak*, 80 M.J. at 633 (citation omitted).

"[C]onvicted servicemembers have a due process right to timely review and appeal of [their] courts-martial convictions." *Moreno*, 63 M.J. at 135 (citations omitted).

In *Livak,* this court established an aggregated sentence-to-docketing 150-day threshold for facially unreasonable delay in cases, like Appellant's, which were referred to trial on or after 1 January 2019. 80 M.J. at 633. A presumption of unreasonable delay also arises when appellate review is not completed, and a decision rendered within 18 months of a case being docketed. *Moreno*, 63 M.J. at 142.

If there is a presumptive or an otherwise facially unreasonable delay, we examine the matter under the four non-exclusive factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *Barker*, 407 U.S. at 530). "We analyze each factor and make a determination as to whether that factor favors the Government or appellant." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533).

"No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citing *Barker*, 407 U.S. at 533). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

There are two facially unreasonable post-trial delays in Appellant's case. First, Appellant's record was not docketed with this court until 290 days after he was sentenced, well over the 150-day threshold we established in *Livak*. Second, a decision in Appellant's case was not rendered within 18 months. Appellant has not raised any issue with this court concerning the post-trial processing of his case and likewise has not claimed any prejudice as a result of either delay.

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. *Moreno,* 63 M.J. at 138–39 (citations omitted). As to the first type of prejudice, where the appellant does not prevail on the substantive grounds of his appeal, as in this case, there is

no oppressive incarceration. *Id.* at 139. Similarly, looking at the third type of prejudice, where an appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id.* at 140. Finally, with regards to the second type of prejudice, anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has made no showing of such particularized anxiety or concern with respect to the delay in question, and we perceive none in his case.

Accordingly, we next consider whether the delays in this case were so egregious as to adversely affect the public's perception of the military justice system. *Toohey*, 63 M.J. at 362. We conclude they are not. Appellant's record was docketed with this court 290 days after he was sentenced. During this time Appellant made no demands for speedy appellate review. Additionally, we note the transcript and record of trial are large and include sealed material. There is also no indication in the record that the delay in docketing this case with this court is the result of Government neglect. As to the delay in completing appellate review, we note that Appellant filed his initial assignments of error on 23 April 2024—490 days after his case was docketed and after seeking and being granted 14 enlargements of time over the Government's opposition. In the enlargement of time requests Appellant agreed to delays requested by his counsel. The Government submitted its answer on 21 June 2024, after seeking to compel declarations to respond to Appellant's allegations of ineffective assistance and requesting one enlargement of time. Appellant submitted his reply brief on 26 July 2024. In the absence of any particularized prejudice to Appellant, we find the delays do not adversely affect the public's perception of the military justice system and therefore did not violate Appellant's right to due process.

Finally, recognizing our authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d), we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is appropriate.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of the Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court